AMOS L. MAZZANT, UNITED STATES DISTRICT JUDGE
The above-entitled and numbered civil action was heretofore referred to United States Magistrate Judge Caroline M. Craven pursuant to 28 U.S.C. § 636. On January 31, 2019, the Magistrate Judge issued a Report and Recommendation, finding for Plaintiff under recommended findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). Dkt.
*1024 # 33. Defendant Hartford Life and Accident Insurance Company ("Defendant") filed objections to the Report and Recommendation. Plaintiff Gina Pike ("Plaintiff") filed a response to the objections. Pursuant to the Magistrate Judge's March 1, 2019 Order, Defendant filed a reply and Plaintiff filed a surreply. The Court conducts a de novo review of the Magistrate Judge's recommended findings and conclusions.
BACKGROUND
This Employee Retirement Income Security Act ("ERISA") action concerns the termination of Plaintiff's long term disability ("LTD") benefits pursuant to 29 U.S.C. § 1132 (a)(1)(B).[1] Defendant issued an insurance policy, identified as Hartford policy number GLT-675193 ("the Policy"), effective January 1, 2005, describing benefits effective July 1, 2016 to Plaintiff's employer, Gambro, Inc. Plaintiff is insured for LTD benefits under the Policy. The Policy does not grant discretionary authority to the Plan Administrator or the Claims Administrator.
Defendant paid Plaintiff's claim for LTD benefits from April 24, 2008 through December 14, 2016, the period of time when Defendant determined Plaintiff met the definition of "disability" in the Policy. However, after later determining Plaintiff was unable to prove she continued to be "disabled" under the Policy, Defendant discontinued LTD benefits effective December 15, 2016. The issue is whether Plaintiff is entitled to receive LTD benefits after December 14, 2016 under the Policy. Plaintiff seeks the benefits she has been denied plus pre-judgment and post-judgment interest, recovery of attorney's fees and costs, clarification of her right to receive future benefits under the policy, and any other appropriate equitable relief. Dkt. # 1 at 3.
The parties stipulated a de novo review applies in this case.[2] See Dkt. # 16.
*1025 The parties then filed cross motions for judgment on the record as well as the administrative record compiled by Defendant during the administration of Plaintiff's claim (the "Agreed Administrative Record" or "AR").
FEDERAL RULE OF CIVIL PROCEDURE 52
Both parties elected to proceed pursuant to Federal Rule of Civil Procedure 52, which governs actions "tried on the facts without a jury." Rule 52 requires the Court "find the facts specifically and state its conclusions of law separately." FED. R. CIV. P. 52(a).
In the Fifth Circuit, "Rule 52(a) does not require that the district court set out [its] findings on all factual questions that arise in a case." Koenig v. Aetna Life Ins. Co. , No. 4:13-CV-0359, 2015 WL 6554347, at *3 (S.D. Tex. Oct. 29, 2015), aff'd sub nom. N. Cypress Med. Ctr. Operating Co., Ltd. v. Aetna Life Ins. Co. , 898 F.3d 461 (5th Cir. 2018) (quoting Valley v. Rapides Parish Sch. Bd. , 118 F.3d 1047, 1054 (5th Cir.1997) (citing Golf City, Inc. v. Wilson Sporting Goods Co., Inc. , 555 F.2d 426, 433 (5th Cir.1977) ) ). Nor does it demand "punctilious detail [or] slavish tracing of the claims issue by issue and witness by witness." Koenig , 2015 WL 6554347, at *3 (citations omitted). Rather, a court's "[f]indings [are sufficient to] satisfy Rule 52 if they afford the reviewing court a clear understanding of the factual basis for the trial court's decision." Id. (citations omitted).
According to courts outside the Fifth Circuit, using Rule 52 is effective in the ERISA context because courts may resolve factual disputes and issue legal findings without the parties resorting to cross motions for summary judgment. Tran v. Minnesota Life Ins. Co. , No. 17-CV-450, 2018 WL 1156326, at *5 (N.D. Ill. Mar. 5, 2018) ; see also Kearney , 175 F.3d at 1095 (noting "the district court may try the case on the record that the administrator had before it."). In a trial on the administrative record, the district judge reviews the evidence to determine "whether [the plaintiff] is disabled within the terms of the policy." Kearney , 175 F.3d at 1095. Further, "in a trial on the record, but not on summary judgment, the judge can evaluate the persuasiveness of conflicting testimony and decide which is more likely true." Id.
REPORT AND RECOMMENDATION
After hearing oral argument on the parties' cross motions, the Magistrate Judge issued a 60-page Report and Recommendation ("R & R") on January 31, 2019, finding for Plaintiff. Dkt. # 33. The Magistrate Judge's recommended findings and conclusions are based upon the Agreed Administrative Record. Plaintiff's lengthy medical history, as well as the facts behind Defendant's termination of LTD benefits, are set forth in detail in the Recommended Findings of Fact section of the R & R and are not duplicated herein.[3] Id. at 4-32.
The Magistrate Judge stated Plaintiff, to obtain LTD benefits beyond December 14, 2016, must show by a preponderance of the evidence that she cannot perform one or *1026 more essential duties of any occupation for which she is qualified. Id. at 36. Based on the Agreed Administrative Record, the Magistrate Judge concluded Plaintiff had shown she could not perform all the essential duties of any occupation for which she is reasonably qualified. Id. at 37. The Magistrate Judge summarized the medical evidence she previously set forth in detail in the Recommended Findings of Fact section of the R & R. Dkt. # 33 at 37-39. Specifically, the Magistrate Judge stated as follows:
Plaintiff has suffered from severe back pain since at least 2002, when a diagnostic lumbar discogram revealed severe pathology at her L4-5, L5-S1 intervertebral levels as well as less severe degeneration at her L3-4 level. AR 507-08. Plaintiff underwent surgery in 2002 on her L4-S1 levels and improved for a time, but she began to deteriorate in 2004. AR 521, 533-34. By 2007, Plaintiff could not sit in a chair, lie in a bed, or stand for any significant length of time. AR 521.
Plaintiff pursued aggressive surgical treatment with neurosurgeon, Robert Martin, M.D. On March 25, 2008, Dr. Martin performed an extreme interbody fusion at L3-4. AR 787-89. In July 2008, Dr. Martin stated Plaintiff could sit for no more than two hours in a day, stand for no more than two hours per day, and walk for no more than two hours per day. AR 1925. Dr. Martin further stated these limitations are permanent. AR 1925.
Still complaining of pain, Plaintiff next sought treatment with Ralph F. Rashbaum, M.D. Dr. Rashbaum diagnosed Plaintiff with "failed back surgery syndrome" and surgically implanted a spinal cord stimulator. AR 2237. The spinal cord stimulator eventually caused an increase in Plaintiff's symptoms, and Dr. Rashbaum surgically removed it in December 2012. AR 1802-03. Dr. Rashbaum recommended Plaintiff start long-term use of class II narcotics. In a "long hard conversation," Dr. Rashbaum advised Plaintiff as follows:
[S]he probably does need to try a class II medication.... I have told her in the past that she will more than likely always be on some form of pain medication, she wanted to avoid class II if possible. I think we have exhausted every other procedure and modality to try to prevent that. I am referring her now to Dr. Bernstein to see if he can find the right medication mix to help reduce her pain so that she can be more active. She wants to do so much, but is very limited physically. I have also provided her with a prescription for handicap parking placard that she can use. I think she pushes herself so far that she has been in such extreme pain that she is bedridden for 2 to 3 days.
AR 2239.
Plaintiff's care then transitioned to pain management physician Sidney Bernstein, M.D., at the Texas Back Institute. Dr. Bernstein stated Plaintiff could sit, stand, and walk for fifteen to twenty minutes at a time and could not do any of the postures for more than a total of four hours per day. AR 1905.
On February 20, 2011, Hartford management reviewed Plaintiff's claim and noted:
[Plaintiff] continues with chronic lower back and leg pain. Dr. Bernstein is managing her medications and making adjustment to help better control [her] pain. [She] is also having side effects from the meds and her weight is also of concern.... Although Dr. Bernstein notes that [Plaintiff] has the capacity to lift up to 10 lbs. frequently and up to 20 lbs. occasionally and able to frequently *1027 fingering and handling, due to chronic intractable pain she is limited to 15-20 minutes sit/stand/walk for no more than 4 hrs/day. Therefore, it is reasonable that [Plaintiff] would be unable to sustain fulltime any occ[upation] activities.
AR 926.
When Dr. Bernstein retired in December 2011, Plaintiff updated Hartford with records from her current pain management physician, Noor Gajraj, M.D. Dr. Gajraj is Board Certified in Pain Management and has treated Plaintiff for more than five years. AR 14. In the most recent Attending Physician's Statement of Disability ("APS") No. 10, dated July 10, 2015, Dr. Gajraj listed Plaintiff's primary diagnosis as lumbar degenerative disc disease and her secondary diagnosis as lumbar radiculopathy. AR 1752-53 (duplicate AR 1783-84). He listed her medications as Dilaudid and Fentanyl and her current subjective symptoms as rightsided low back pain and right leg pain and tenderness. AR 1752. He opined Plaintiff could walk, stand, and sit for fifteen to twenty minutes at a time and for no longer than four hours per day. AR 1753.
The Magistrate Judge considered the opinions of Plaintiff's treating physicians and the supporting evidence of their opinions, such as the surveillance and objective medical records and Defendant's actions over the course of several years. The Magistrate Judge found the treating physicians' opinions reliable and probative, concluding as follows:
Based on the Agreed Administrative Record, Plaintiff has demonstrated by a preponderance of the evidence that she cannot perform the essential duties, which includes the ability to work a full work week, of any occupation for which she qualifies. Plaintiff has shown by a preponderance of the evidence that her disability persisted beyond December 14, 2016.
Dkt. # 33 at 55.
In her de novo review, the Magistrate Judge also considered the evidence relied upon by Defendant in justifying its termination of benefits and found no evidence of improvement in Plaintiff's condition since Defendant previously found Plaintiff was unable to sustain full time work in any occupation. Id. The Magistrate Judge concluded it was improper for Defendant to cease Plaintiff's LTD benefits, and Plaintiff is entitled to the reinstatement of her LTD benefits beginning December 15, 2016. Id. Thus, the Magistrate Judge recommended Plaintiff's Motion for Judgment on the Record be granted and Defendant's Cross-Motion for Judgment on the Record be denied.
The Magistrate Judge also considered whether pre-judgment interest, costs, and attorney's fees should be awarded as requested by Plaintiff. The Magistrate Judge found Plaintiff is entitled to receive LTD benefits from December 15, 2016, and to recover pre-judgment interest on those unpaid benefits. Id. at 56. She also found the circumstances support an award to Plaintiff for attorney's fees and costs, in addition to the benefits amount owed to her under the Policy. Id. at 59.
However, rather than specifically recommend an award of fees and costs, the Magistrate Judge recommended that Plaintiff be directed to file, within twenty days from the date of any Order adopting the R & R, a motion for pre-judgment interest, costs, and attorney's fees. Id. The R & R specifies that any such motion must be legally and factually supported and that Defendant shall file a response.
OBJECTIONS
Defendant filed three main objections to the Report and Recommendation ("R & R"), the first and second of which the *1028 Court considers first in its de novo review of the R & R. In the first main objection, Defendant asserts the R & R fails to follow appropriate ERISA law and the Policy language, which leads to erroneous findings of fact and legal conclusions. This objection has six specific sub-arguments, which the Court lists herein in the order it will consider them: (1) the R & R errs in misstating the Policy's definition of "disability;" (2) the R & R improperly relies on outdated records for its conclusion on present disability; (3) the R & R errs in applying the "treating physician rule" and giving deference to Plaintiff's treating physicians over independent reviewing physicians; (4) the R & R wrongly relies on Plaintiff's subjective complaints as opposed to objective evidence; (5) the R & R erroneously uses Plaintiff's attorney's arguments in briefing as findings; and (6) the R & R "cherry-picks" from the AR instead of reconciling the evidence as the plan administrator must do in its benefits decision. Defendant also argues the R & R improperly shifts the burden to Defendant to show evidence of improvement.
In its related second main objection, Defendant asserts the R & R relies on law outside the Fifth Circuit that is contrary to the way the Fifth Circuit will decide the issues. Specifically, Defendant argues the alleged "factual and legal errors lead the R & R to look to a district court case within the Ninth Circuit that does not represent how the Fifth Circuit views these issues." Dkt. # 37 at 2. According to Defendant, the Magistrate Judge does not address the case law cited by Defendant. Dkt. # 37 at 20. Finally, in its third main objection, Defendant asserts the R & R purports to award Plaintiff attorney's fees without any motion practice and based on erroneous factual and legal conclusions.
In her response, Plaintiff emphasizes the standard in this case is de novo review as opposed to abuse of discretion.[4] Plaintiff argues Defendant's objections revisit a number of contested fact issues raised in the underlying briefing on which the Magistrate Judge found Plaintiff's evidence to be more compelling. Rather than "cherry pick" the Agreed Administrative Record, Plaintiff asserts the Magistrate Judge explained in detail why she found some evidence more probative and some evidence less probative. Dkt. # 38 at 12. Even though the Magistrate Judge indicated an award of attorney's fees would be appropriate, Plaintiff points out the R & R did not award attorney's fees and costs to Plaintiff but specifically recommended the parties be ordered to further brief the issue.
THE UNDERSIGNED'S DE NOVO REVIEW OF R & R
Standard and scope of de novo review of this ERISA case
Although the parties have agreed the Court's evaluation of this ERISA case *1029 should be subject to Firestone's default de novo review, the parties' arguments reflect a fundamental disagreement as to what such a review entails. The Court provides the following background as to why the Magistrate Judge found it necessary to reference law from outside this circuit in determining what such a review entails. A little over one year ago, a majority of the en banc Fifth Circuit Court of Appeals overruled its precedent, Pierre v. Conn. Gen. Life Ins. Co. , 932 F.2d 1552 (5th Cir. 1991), which held challenges to an administrator's factual determination that a beneficiary is not eligible must be reviewed under the same abuse of discretion standard that applies when plans have delegated discretion. Ariana M. v. Humana Health Plan of Tex., Inc. , 884 F.3d 246, 256 (5th Cir. 2018) (en banc) (" Ariana M. I ").
In overruling Pierre , the Fifth Circuit became aligned with seven other courts of appeals which long ago determined the Supreme Court in Firestone Tire & Rubber Co. v. Bruch , 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) mandated that courts apply a de novo standard of review to all ERISA benefits determinations regardless of whether the denials under review were legally-based plan interpretations or factually-based eligibility determinations, unless an administrator has discretionary authority. See Ariana M. I , 884 F.3d at 248, 255. In Ariana M. I , the Fifth Circuit vacated the district court's order granting summary judgment and remanded for de novo review. Id. at 256.
Like the Magistrate Judge, the Court has been unable to locate any relevant cases from within the Fifth Circuit that elaborate on the de novo standard of review or that apply such a review in facts similar to this case. In its objections, Defendant relies on the trial court's decision in Ariana M. following remand, wherein the court stated de novo review "requires that the court apply the same standard as the plan administrator in deciding whether the benefits were owed under the plan's terms." Ariana M. v. Humana Health Plan of Texas, Inc. , No. H-14-3206, 2018 WL 4384162, at *12 (S.D. Tex. Sept. 14, 2018) (" Ariana M. II "). Although Defendant agrees no deference is accorded to the administrator's decision, relying on this language in Ariana M. II , Defendant argues nothing about de novo review changes the "long-standing legal principles for administration of an ERISA claim under the terms of the plan." Dkt. # 37 at 1.
On the other hand, in her response, Plaintiff argues de novo review requires the Court to independently weigh the facts and opinions in the administrative record to determine whether the claimant has met her burden of showing she is disabled with the meaning of the policy. Dkt. # 38 at 1-2 (citing Richards v. Hewlett-Packard Corp. , 592 F.3d 232, 239 (1st Cir. 2010) ). Plaintiff asserts what happened before the plan administrator is irrelevant. Dkt. # 38 at 1 (citing Diaz v. Prudential Ins. Co. of Am. , 499 F.3d 640, 643 (7th Cir. 2007) ). According to Plaintiff, this is what the Magistrate Judge did: "In order to conduct the Trial on the Papers in this case, [she] reviewed 151 pages of briefing by the parties, a 2,266 page Agreed Record, and held a 2-hour oral hearing. Her Report and Recommendation (R & R) includes over 300 factual citations to the Agreed Record." Dkt. # 38 at 2.
In its order on remand following Ariana M. I , the district court in Ariana M. II reviewed the administrative record de novo to determine whether Humana wrongfully denied Ariana M. benefits. 2018 WL 4384162, at *12. The court stated de novo review requires that the court apply the same standard as the plan administrator *1030 in deciding whether the benefits were owed under the plan's terms. Id. (citing Hightower v. Tex. Hosp. Ass'n , 65 F.3d 443, 447 (5th Cir. 1995) ). However, the Fifth Circuit in Hightower simply stated that de novo review requires that the appellate court apply the same standard as the district court when deciding whether summary judgment was properly granted.[5] The question remains whether the district court's de novo review of a plan administrator's decision is the same as an appellate court's de novo review of a district court's grant of summary judgment.
To answer this question, the Magistrate Judge referenced cases from other circuits, specifically noting she had not located post- Ariana M. I cases similar to this one from within this circuit which provide guidance as to the Court's task under the de novo review standard. Dkt. # 33 at 34, n. 18. In the absence of specific law from the Fifth Circuit on this issue, the Court finds it appropriate to consider law from other circuits for guidance on de novo review.
The R & R referenced law from the First, Sixth, Ninth, Tenth, and Eleventh Circuit Courts of Appeals, all of which are consistent in their treatment of de novo review in the ERISA context. Under the de novo standard of review, the court's task "is to determine whether the administrator made a correct decision." Niles v. Am. Airlines, Inc. , 269 Fed. Appx. 827, 832 (10th Cir. 2008) (quoting Hoover v. Provident Life and Accident Ins. Co. , 290 F.3d 801, 808-09 (6th Cir.2002) ). According to the Magistrate Judge, Defendant's decision to terminate benefits is not afforded deference or a presumption of correctness. Dkt. # 33 at 34 (citing Niles , 269 Fed. Appx. at 832 ). As set forth in the R & R, the court must, in a de novo review, "independently weigh the facts and opinions in the administrative record to determine whether the claimant has met his burden of showing that he is disabled within the meaning of the policy." Dkt. # 33 at 34-35 (quoting Richards , 592 F.3d at 239 ).
The R & R noted the burden of proof is on the plaintiff to prove she is disabled even when a court reviews a plan administrator's decision under the de novo standard. Dkt. # 33 at 35 (citing Oliver v. Aetna Life Ins. Co. , 613 Fed. Appx. 892, 896 (11th Cir. 2015) ("[T]he plaintiff bears the burden to prove that he is disabled.") ). The R & R further noted the burden of proof does not change because a plaintiff qualified at one point in time for disability benefits and the benefits were later terminated when she no longer qualified. Dkt. # 33 at 35 (citing Muniz v. Amec Constr. Mgmt., Inc. , 623 F.3d 1290, 1294-96 (9th Cir. 2010) ("the burden of proof continues *1031 to lie with the plaintiff when disability benefits are terminated after an initial grant") ). As urged by Defendant in its cross motion for judgment on the record, the Magistrate Judge stated the plaintiff bears the burden of proving by a preponderance of the evidence that she is disabled. Dkt. # 33 at 35 (citing Gilewski v. Provident Life & Accident Ins. Co. , 683 Fed. Appx. 399, 406 (6th Cir. 2017) ("[Plaintiff] must prove by a preponderance of the evidence that he was 'disabled,' as that term is defined in the policy."); see also Dewsnup v. Unum Life Ins. Co. of Am. , No. 2:17-CV-00126-TC, 2018 WL 6478886, at *7 (D. Utah Dec. 10, 2018) (citing Niles , 269 Fed. Appx. at 833 ) ("To prevail, a claimant's entitlement to benefits must be supported by a preponderance of the evidence based on the court's review of the record.") ).
Applying the de novo review standard to Plaintiff, the Magistrate Judge did not give deference to Defendant's decision. Rather, she evaluated the persuasiveness of each side's case to determine if Plaintiff has adequately established that she is disabled under the Policy. Dkt. # 33 at 36-37 (citing Houghton v. Hartford Life & Accident Ins. Co. , No. C16-1186RAJ, 2017 WL 3839577, at *4 (W.D. Wash. Aug. 31, 2017) (citing Oldoerp v. Wells Fargo & Co. Long Term Disability Plan , 12 F.Supp.3d 1237, 1251 (N.D. Cal. 2014) ) ) ).
With these standards in mind, the Court considers the substantive arguments raised by Defendant in its objections.
Discussion of the first and second main objections
As previously stated, in its first main objection, Defendant argues the R & R fails to follow long-standing ERISA principles and Policy language, asserting the following specific arguments: (1) the R & R errs in misstating the Policy's definition of "disability;" (2) the R & R improperly relies on outdated records for its conclusion on present disability; (3) the R & R errs in applying the treating physician rule and giving deference to Plaintiff's treating physicians over independent reviewing physicians; (4) the R & R wrongly relies on Plaintiff's subjective complaints as opposed to objective evidence; (5) the R & R erroneously uses Plaintiff's attorney's arguments in briefing as findings; and (6) the R & R "cherry-picks" from the AR instead of reconciling the evidence as the plan administrator must do in its benefits decision. The Court considers each specific argument below. In its discussion on the third sub-argument regarding the treating physician rule, the Court will also address Defendant's second main objection, that the R & R improperly relies on law outside the Fifth Circuit.
Whether the R & R misstates the Policy's definition of "disability"
In its first sub-argument, Defendant maintains the R & R makes findings that imply a diagnosis is the same as "disability." Dkt. # 37 at 14. Defendant argues a diagnosis is not a condition of coverage under the Policy; rather, the issue is whether Plaintiff is disabled as the term is defined in the Policy.
As set forth in the Recommended Findings of Fact section of the R & R, under the Policy, a claimant is entitled to LTD benefits if she is "disabled" throughout and beyond the "Elimination Period" (the first 90 days of disability). Dkt. # 33 at 4 (citing Dkt. # 17-1 at 25-26). A claimant is "disabled" during the first 24 months if she is "prevented from performing one or more of the Essential Duties" of her "Own Occupation." Id. The Policy changes its definition of disability after 24 months' benefits have been paid. Thereafter, a claimant is "disabled" if she is "prevented from performing one or more of the Essential Duties" of "Any Occupation." Id.
*1032 "Any Occupation" means any occupation for which the claimant is qualified by education, training or experience and that has an earnings potential greater than the lesser of the product of the claimant's "Indexed Pre-disability earnings and the Benefit Percentage;" or "the Maximum Monthly Benefit." Dkt. # 33 at 4 (citing Dkt. # 17-1 at 25).
"Essential Duty" means a duty that:
1) is substantial, not incidental;
2) is fundamental or inherent to the occupation, and
3) cannot be reasonably omitted or changed.
Dkt. # 33 at 4 (citing Dkt. # 17-1 at 26).
Contrary to Defendant's assertion, the R & R correctly states the definition of "disabled" and correctly applies that definition to the facts in the record. Noting Plaintiff's LTD Claim was effective April 24, 2008, the Magistrate Judge correctly stated the definition of "disabled" changed under the Policy on April 24, 2010, from "Own Occupation" to "Any Occupation." Dkt. # 33 at 4 (citing AR 1030-31). Thus, according to the Magistrate Judge, Plaintiff was only entitled to LTD benefits beyond April 24, 2010 if she was unable to perform the essential duties of any occupation. Id. The Magistrate Judge also noted a claimant's ability to work the number of hours in her regularly scheduled workweek is an "Essential Duty." Dkt. # 33 at 4 (citing Dkt. # 17-1 at 26).
After identifying the proper definition of disability, the R & R discusses in detail the evidence establishing that Plaintiff cannot work a regular workweek. According to Defendant, the issue is whether there are supported physical and mental limitations for Plaintiff, "and whether in the context of those limitations, [Plaintiff] is rendered incapable of performing job duties of any occupation that meet the earnings standard, as defined by the [Policy]." Dkt. # 37 at 15. Defendant further argues the Magistrate Judge's focus on the earnings requirement reduces the "import of the employability analyses" Defendant conducted. Id. Defendant reasons as follows:
The analysis married the claimant's physical capabilities, education, training, work history, and the definition's earnings requirement. AR 1926-33 (EAR), 1508-19 (First EAR Addendum), 1323-39 (Second EAR Addendum). The fact that Hartford's last employability analysis (AR 1323-39) identified 'high-paying' jobs should not overshadow the fact that the jobs also suited Pike's overall functionality, including her physical and mental capacity for work based on the opinions of two treating physicians and two independent reviewing physicians.
Id.
In the Recommended Findings of Fact section of the R & R, the Magistrate Judge set forth the information Defendant began to gather in October 2009 regarding Plaintiff's functional capacity. Dkt. # 33 at 11-12. As requested, Plaintiff's then-treating orthopedic surgeon, Dr. Rashbaum, provided APS No. 4, which stated Plaintiff could not reach or perform fingering or handling. He provided no restrictions or limitations for sitting, standing, or walking. Dkt. # 33 at 11 (citing AR 1916-17); see also id. at 7. Defendant asked Dr. Rashbaum to specify his opinion on Plaintiff's ability to sit, stand, and walk. AR 944-45. Dr. Rashbaum sent an APS dated March 12, 2010, but it also provided no specific assessment of restrictive limitations, and instead annotated "Patient Unable to Work." AR 1914-15 ("APS No. 5").
Dr. Rashbaum later provided an APS dated April 20, 2010. AR 1909-10 ("APS No. 6"). APS No. 6 explained that Plaintiff could frequently reach at desk level and lift/carry up to ten pounds, but sitting, *1033 standing, or walking were all limited to fifteen or twenty minutes at a time, up to four hours total. AR 1909-10, 1912-13. On April 20, 2010, Dr. Rashbaum's office clarified that Plaintiff's functional capacity was limited to four hours a day.
On April 22, 2010, Defendant conducted an employability analysis (the first "EAR"), which evaluated whether there were any occupations Plaintiff was capable of performing based upon her functional capabilities as specified by Dr. Rashbaum in APS No. 6, education (Bachelor of Science in microbiology), training, and work history, and which would meet the earnings requirement in the Policy. Dkt. # 33 at 11-12 (citing AP 938-40, 1926-33). The EAR identified no occupations. Dkt. # 33 at 12 (citing AR 940, 1927).
On August 30, 2016, Defendant advised Plaintiff she was required to attend an independent medical examination ("IME") to clarify her current maximum level of functional ability. Dkt. # 33 at 21 (citing AR 895-96, 995-96). Board Certified Physical Medicine and Rehabilitation physician, John Sklar, M.D., examined Plaintiff in October 2016 prior to Defendant's initial decision to terminate benefits. Id. at 22, 48 (citing AR 1528-30). Defendant asked Dr. Sklar whether, given the totality of the medical evidence and other information provided, he felt there are any restrictions or limitations as to Plaintiff's activity, and if so, would she be capable of performing activity up to forty hours per week with these restrictions. Dkt. # 33 at 22-23 (citing AR 1530).
In response, Dr. Sklar opined Plaintiff could work a light or sedentary occupation up to forty hours a week with the following restrictions and limitations based on her chronic pain condition and "[t]o accommodate her pain:" ability to change positions on an as needed basis with up to six hours per day of sitting and the rest of the day spent in a combination of standing and walking for up to two hours; occasionally lifting up to twenty pounds; and no repetitive bending or twisting. Dkt. # 33 at 23 (citing AR 1530). Dr. Sklar further stated as follows:
This claimant has pain. Pain is clearly not a reason not to work and the evidence based medical literature suggests that persons with chronic pain are actually well served by engaging in normal life activities especially work.
Work then is not only reasonable here it would be a part of the claimant's reasonable treatment plan to treat her pain complaints. I make these recommendations then in the claimant's best interest. It would be predicted that if she continues on an off-work status her situation will continue to deteriorate and returning to work is the one intervention which would actually be expected to stop that deterioration from occurring.
Id.
On December 8, 2016, Defendant updated the first EAR using Dr. Sklar's restrictions and limitations in the IME Report. See Dkt. # 33 at 24, 53 (citing AR 1508-09 ("First EAR Addendum") ). Unlike the first EAR, the First EAR Addendum identified several occupations Plaintiff was well-suited for based on her education, training, and work history, and which met the earnings requirement in the Policy (i.e. , quality-control coordinator, administrative assistant, director of research and development, consultant, project direction, executive secretary). AR 1511-12. "Essentially, the First EAR Addendum found Plaintiff could return to her former occupation, or a similar occupation. AR 1508-09; 1513-19 (as one example, the executive secretary or executive administrative assistant occupation identified is described as providing 'high-level administrative support'
*1034 and also training and supervising lower-level clerical staff)." Dkt. # 33 at 24.
As part of its consideration of Plaintiff's appeal, Defendant obtained a Peer Review Report in July 2017 from Board Certified Physical Medicine and Rehabilitation and Board Certified Pain Medicine physician Dr. Jamie L. Lewis. Dkt. # 33 at 29-30; see also AR 1341-54 (Peer Review Report). In his Peer Review Report, Dr. Lewis agreed with Dr. Skylar's IME and found Plaintiff would have the capacity to perform gainful employment on a full time basis with certain "ongoing and indefinite" restrictions. Dkt. # 33 at 50 (citing AR 1349-50). According to Dr. Lewis, although Plaintiff has continued pain complaints, "there are no objective findings that would prevent her ability for sustainable work 40 hours per week." Dkt. # 33 at 50 (citing AR 1350).
In determining whether Plaintiff is capable of performing the essential duties of any occupation, the Magistrate Judge accorded significant weight to the evaluation of Plaintiff by her treating physicians, who have repeatedly concluded Plaintiff can sit, stand, and walk for no more than four hours a day. Dkt. # 33 at 53. According to the Magistrate Judge, these evaluations, along with the evidence regarding Plaintiff's chronic pain and the effects of her pain medication, persuade the Court Plaintiff could not continuously engage in any occupation for which she would be qualified. Id. at 53-54. As will be addressed in more detail below, the Magistrate Judge accorded minimal weight to Dr. Sklar's IME Report, and thus accorded minimal weight to the First EAR Addendum on which it relied. Id. at 54 ("Dr. Skylar's conclusions contradicted those of Plaintiff's treating physicians and thus the First EAR Addendum may not have accurately returned jobs that could be performed by Plaintiff.").
Although Defendant's basic assertion that "a diagnosis is not the same as a disability" is correct, Defendant "over-states this rather generalized objection." Schowalter v. Prudential Ins. Co. of Am. , No. 1:13-CV-249-HJW, 2014 WL 5513710, at *8 (S.D. Ohio Oct. 31, 2014). Similar to the court in Schowalter , the Court does not agree the Magistrate Judge's extensive analysis "conflated" these concepts. Id. For example, the Magistrate Judge emphasized Plaintiff's treating physician, Dr. Gajraj, made clear in his letter dated June 6, 2017 that Plaintiff remained "disabled from competitive work, noting she could not perform more than two to four hours of work per day and would require significant time off-task each day." Dkt. # 33 at 43-44. She also considered, and found unpersuasive, the evidence relied upon by Defendant in support of its assertion that Plaintiff had regained functionality. Id. at 45-52. The R & R reflects the Magistrate Judge appropriately recognized that Plaintiff's "functional abilities (despite her conditions) were the main issue." Schowalter , 2014 WL 5513710, at *8.
The Court is not convinced, as suggested by Defendant, the Magistrate Judge implied a diagnosis is the same as a "disability" as that term is defined under the Policy. The Court finds Defendant's arguments regarding the R & R's definition of "disability" without merit. The Court next considers whether the R & R improperly relies on outdated records.
Whether the R & R improperly relies on outdated records for its conclusion on present disability
In its next sub-argument, Defendant asserts the Magistrate Judge focused on outdated medical records, outdated notations by Defendant in the claims notes, and outdated offers of settlement and payments, asserting past records do not serve to prove present disability. Dkt. # 37 at 9.
*1035 Among other things, Defendant criticizes the R & R for "lean[ing] heavily on outdated notations in the claims notes by Hartford at the time of Hartford's previous determinations that Pike met the definition of 'disability' under the [Policy] earlier in the administration of the claim." Id. at 10. According to Defendant, all of these outdated notations occur before Defendant obtained updated medical records which show Plaintiff was "doing well overall" and "[h]er current medications are effective." Id.
According to Defendant, the Magistrate Judge failed to address changes in Plaintiff's current medical records. As one example, Defendant asserts the R & R emphasized Dr. Martin, the neurosurgeon that performed Plaintiff's extreme interbody fusion at L3-4, provided limitations in July 2008 that he opined were permanent. Dkt. # 33 at 37 (citing AR 1925). According to Defendant, Dr. Martin last saw Plaintiff in September 2008, and the IME by Dr. Sklar (discussed in detail below) was conducted in September 2016. Defendant argues as follows:
It follows that limitations based on an October 2016 physical examination of Pike better reflect Pike's present day functionality. Compare Dr. Martin's limitations at AR 1925 (sit for no more than two hours in a day, stand for no more than two hours per day, and walk for no more than two hours per day), with the IME's limitations at AR 1530 (sit up to six hours a day, stand up to two hours a day, walk up to two hours a day).
Dkt. # 37 at 9-10.
In conducting a de novo review, "the Court must resolve questions of material fact, assess expert credibility, and-most critically-weigh the evidence." Weisner v. Liberty Life Assurance Company of Boston , 192 F.Supp.3d 601, 614 (D. Md. 2016)"When reviewing a benefits denial de novo , the Court's 'job is to make [its] own independent determination of whether [the claimant] was entitled to the ... benefits. The correctness, not the reasonableness, of [the] denial of ... benefits is [the Court's] only concern....' " Mantica v. Unum Life Ins. Co. of Am. , No. CV RDB-18-0632, 2019 WL 1129438, at *7 (D. Md. Mar. 12, 2019) (quoting Weisner , 192 F.Supp.3d at 613 (quoting Johnson v. Am. United Life Ins. Co. , 716 F.3d 813, 819 (4th Cir. 2013) ) ). As previously noted and as understood by the Magistrate Judge, "[t]he de novo standard of review allows the court to examine all of the evidence in the record and decide whether or not the Plaintiff is totally disabled without giving any deference to the plan administrator's decision to deny or terminate disability benefits." Gluth v. Fed. Home Loan Mortg. Corp. Long-Term Disability Plan , Civ. No. 1:11-cv-1126, 2013 WL 246897, at *4 (E.D. Va. Jan. 17, 2013)aff'd , 548 Fed. Appx. 73 (4th Cir.2013) (mem.).
Here, the Magistrate Judge considered in detail the evidence in the Agreed Administrative Record and specifically the evidence both supporting and undercutting Plaintiff's claim for continued LTD benefits. Some of the evidence from Plaintiff's treating physicians (whose opinions she found reliable and probative) pre-dates Defendant's termination of benefits, but that does not necessarily make it less probative of Plaintiff's present condition. As noted by the Magistrate Judge, there is evidence in the Agreed Administrative Record indicating Plaintiff's functional impairments persisted beyond December 14, 2016. Dkt. # 33 at 39.
Specifically, the Magistrate Judge noted there are numerous indications from Plaintiff's physicians, and from Defendant's notations, that improvement is not likely with Plaintiff's condition. See , e.g. , AR 1925 (Dr. Martin stating in 2008 the limitations are *1036 permanent); AR 955 (note from September 21, 2009 that there was still pain that could be residual damage to the nerves from the hardware hitting the nerve or the original injury and further noting if it was nerve damage it could take 12-18 months to resolve "if at all ") (emphasis added in R & R); AR 956 ("Went to Texas Back Institute on 06/01/2009 and revealed she had permanent nerve damage from the screws.") (emphasis added in R & R); AR 963-64; 2215-2218 (July 16, 2009 sensory nerve conduction study ) (revealing "reduced recruitment and an increased proportion of high amplitude long duration MUAP's in the bilateral L5 myotomes"); AR 922 (June 2011 notation by Defendant that due to her medical history of multiple failed back surgeries and her continued need to take class II medications, "it was likely [Plaintiff] would be unable to participate in any type of work activity on a full time basis" and also noting Plaintiff's level of medication and need to be "bedridden for multiple days at a time would impact even limited activity and would be unable to sustain full time work").
According to Plaintiff, evidence of "permanent" limitations in 2008 and "permanent" nerve damages in 2009 is probative that these conditions continued to exist in 2016 when Defendant terminated Plaintiff's LTD benefits. The Court agrees. Additionally, the Magistrate Judge did not limit her discussion to evidence pre-dating the termination. For example, in updated records from Plaintiff's pain management physician, Dr. Gajraj, for six office visits between February 17, 2015, and May 6, 2016, Dr. Gajraj wrote that "[Plaintiff] is taking her medication as prescribed without significant side-effects and is gaining benefit in terms of analgesia and increased function." Dkt. # 33 at 18 (citing AR 1742-46, 1749). However, each record also noted Plaintiff's chief complaint remained "right-sided low back pain and right leg pain." Id.
In its objections, Defendant focuses on Dr. Gajraj's statement in each record that Plaintiff was taking her "medication as prescribed without significant side-effects and is gaining benefit in terms of analgesia and increased function." Defendant further asserts the most recent May 6, 2016 record states Plaintiff "is doing well overall" and "[h]er current medications are effective." Defendant argues these statements render any claims notations prior to Defendant's receipt of Dr. Gajraj's records in June 2016 irrelevant to Plaintiff's "present-day disability." Dkt. # 37 at 15. According to Defendant, these 2015 and 2016 records clearly provided Defendant with more recent information on which to base its decision.
Before addressing Defendant's separate argument regarding "outdated notations" in its claims notes, the Court notes it does not find Dr. Gajraj's statements that Plaintiff was "gaining benefit in terms of analgesia and increased function" as determinative as Defendant. Nor do these records render any claims notations prior to Defendant's receipt of those records irrelevant to the Court's de novo review. First, as noted by the Magistrate Judge, Dr. Gajraj's assessment in each record was lumbar degenerative disease/radiculopathy. Dkt. # 33 at 19. During this time, Dr. Gajraj also obtained an objective medical test, a Sudoscan on May 14, 2015, to detect peripheral neuropathy (damage to the peripheral nerves). Id. (citing AR 1747-48 (Sudoscan Report) ). Plaintiff's Sudoscan found possible early signs of peripheral autonomic neuropathy.[6] Dkt. # 33 at 19 (citing AR 1747).
*1037 Importantly, with her appeal of the December 15, 2016 decision to terminate LTD benefits, Plaintiff's counsel submitted to Defendant a letter from Dr. Gajraj dated June 6, 2017. In this letter, Dr. Gajraj states as follows:
I am a Board Certified Pain Management doctor and have been [Plaintiff's] treating physician or more than five years. I am very familiar with her condition.
[Plaintiff] suffers from chronic pain, secondary to lumbar degenerative disc disease /radiculopathy. Although she is capable of performing limited light tasks, I do not believe she is capable of working in a competitive environment. Even limited physical exertions cause her to require significant down time. If she were to attempt to return to even a sedentary work environment, she would require significant time off-task each day. I believe she could perform no more than 2-4 hours of work per day. She additionally requires the fentanyl patch 100 mcg/hr and Dilaudid simply to achieve limited function. These medications, however can impact cognition and the ability to perform detailed tasks. I consider [Plaintiff] to be disabled from competitive work.
Dkt. # 33 at 28 (citing AR 14). According to Plaintiff's response, Dr. Gajraj's opinion from June 6, 2017 is more than sufficient to support a finding that Plaintiff remains disabled under the Policy.
The Magistrate Judge stated Dr. Gajraj noted Plaintiff is capable of performing limited light tasks; even so, she is not capable of working in a competitive environment, even in a sedentary work environment. Dkt. # 33 at 47 (citing AR 14). The Magistrate Judge noted Plaintiff's treating physicians' relationships with Plaintiff allowed them to personally observe the effects of her diagnoses and assess the credibility of her reports of pain. Dkt. # 33 at 51. Specifically, "Plaintiff's pain management treating physician for over five years, stated in 2017 that Plaintiff suffers from chronic pain, secondary to lumbar degenerative disc disease /radiculopathy and is disabled." Id. (citing AR 14).
Additionally, Defendant argues the "outdated notations in the claims notes in the AR rely on [Plaintiff's] subjective reporting, not on objective medical determinations." Dkt. # 37 at 15. According to Defendant's argument, "[p]roper claims administration says that the administrator should record what the claimant is stating and reporting to the Plan on her claim; but notations of subjective statements by Pike to Hartford does not mean there is 'disability' under the Plan." Id.
A specific "outdated" notation the Magistrate Judge relied upon was from April 2010, wherein Defendant noted Plaintiff had chronic pain which radiated down the leg which may be due to nerve damage. Dkt. # 33 at 12 (citing AR 937). It was noted Plaintiff had been referred to Dr. Bernstein (Plaintiff's first pain management physician) with chronic low back pain and leg pain. According to the Recommended Findings of Fact of the Magistrate Judge, Defendant determined as follows:
Based on the history of the clmt's multiple back surgeries, continued treatment for severe back pain and in to her legs (including class II meds and spinal stimulator) it is likely clmt would be unable to participate in any type of work activity on a full time basis. Clmt's level of medication and need to be bed-ridden for multiple days at a time would impact *1038 even limited activity and would be unable to sustain full time work.
Dkt. # 33 at 12 (quoting AR 941).
Not only did the Magistrate Judge consider Defendant's own notations, she also considered that between November 2010 and July 2015, Plaintiff routinely updated Defendant regarding the status of her pain management with Dr. Bernstein and her new pain management physician, Dr. Gajraj, following Dr. Bernstein's retirement. Dkt. # 33 at 13. In the most recent APS No. 10, dated July 10, 2015, Dr. Gajraj listed Plaintiff's primary diagnosis as lumbar degenerative disc disease and her secondary diagnosis as lumbar radiculopathy. Id. (citing AR 1752-53). Dr. Gajraj listed Plaintiff's medications as Dilaudid and Fentanyl and her current subjective symptoms as right sided low back pain and right leg pain and tenderness. Id. (citing AR 1752). He opined Plaintiff could walk, stand, and sit for fifteen to twenty minutes at a time and for no longer than four hours per day. Id. (citing AR 1753). Dr. Gajraj also stated he did not believe Plaintiff was competent to direct the use of her claim proceeds.[7] Id. (citing AR 1753).
As set forth by the Magistrate Judge, on February 20, 2011, Hartford management reviewed Plaintiff's claim and noted:
[Plaintiff] continues with chronic lower back and leg pain. Dr. Bernstein is managing her medications and making adjustment to help better control [her] pain. [She] is also having side effects from the meds and her weight is also of concern.... Although Dr. Bernstein notes that [Plaintiff] has the capacity to lift up to 10 lbs. frequently and up to 20 lbs. occasionally and able to frequently fingering and handling, due to chronic intractable pain she is limited to 15-20 minutes sit/stand/walk for no more than 4 hrs/day. Therefore, it is reasonable that [Plaintiff] would be unable to sustain fulltime any occ[upation] activities.
Dkt. # 33 at 14 (quoting AR 926).
On June 4, 2011, Defendant determined that, due to her medical history of multiple failed back surgeries and her continued need to take class II medications, "it was likely [Plaintiff] would be unable to participate in any type of work activity on a full time basis." Id. (citing AR 922). It was further noted that Plaintiff's level of medication and need to be "bed-ridden for multiple days at a time would impact even limited activity and would be unable to sustain full time work." Id. (citing AR 922).
The Court does not find the Magistrate Judge's reliance on these notations improper. Nor does the Court agree with Defendant that all the notations only reflect Plaintiff's subjective reporting and do not reflect objective determinations. The notations are especially relevant to how, at least at one time, Defendant viewed Plaintiff's use of class II medications and how that would impact even limited activity and her ability to sustain full time work.
Defendant argues a "fatal problem with the R & R's use and analysis of outdated records to prove disability is that it shifts the burden of proof." Id. at 7. According to Defendant, although the R & R "pays lip service" to the burden of proof (Dkt. # 33 at 35-36), "its findings impermissibly shift *1039 the burden of proof to Hartford to show that Pike is no longer disabled." Dkt. # 37 at 7 (citing Dkt. # 33 at 39-40 ("Hartford previously determined Plaintiff could not perform the essential duties of any occupation after the definition of 'disabled' changed on April 29, 2010.... Here, Hartford paid LTD benefits under the more restrictive definition of 'disabled' for over six years, until December 14, 2016; thus, the Court would expect to see evidence of improvement in the record."); id. at 55 ("The Court, having considered all of the evidence relied upon by Hartford in justifying its termination of benefits, finds no evidence of improvement in Plaintiff's condition since Hartford previously found she was unable to sustain full time work in any occupation.") ). Defendant argues as follows:
Under the R & R's rationale and findings, once disabled and once benefits have been paid, an administrator cannot cease payments unless it can show that the claimant has improved . This is contrary to what the Fifth Circuit has said about the burden of proof on disability claims under the 'any occupation' standard. Hilton v. Ashland Oil Inc. , 103 F.3d 124 (5th Cir. 1996) (unpublished) (abuse of discretion standard of review).
Dkt. # 37 at 8 (emphasis in original).
In her discussion, the Magistrate Judge agreed with Defendant's argument that an administrator's past payment of benefits does not "operate forever as an estoppel so that an insurer can never change its mind." Id. However, the Magistrate Judge stated Defendant failed to acknowledge that past payment of benefits can be a consideration in the Court's de novo review. Dkt. # 33 at 39-40 (citing Muniz v. Amec Const. Mgmt., Inc. , 623 F.3d 1290, 1297 (9th Cir. 2010)[8] (quoting McOsker v. Paul Revere Life Insurance Co. , 279 F.3d 586, 589 (8th Cir.2002) ) ). The Magistrate Judge noted in McOsker , an abuse of discretion case, the Eighth Circuit stated that *1040 paying benefits does not operate "forever as an estoppel so that an insurer can never change its mind; but unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments ." Dkt. # 33 at 40 (quoting McOsker , 279 F.3d at 589 (emphasis added in R & R) ).
The Magistrate Judge also cited Saffon v. Wells Fargo & Co. Long Term Disability Plan , 522 F.3d 863 (9th Cir. 2008), wherein the Ninth Circuit Court of Appeals stated "MetLife had been paying Saffon long-term disability benefits for a year, which suggests that she was already disabled." Dkt. # 33 at 40 (quoting Saffon , 522 F.3d at 871 ). The court opined that to find the plaintiff no longer disabled, "one would expect the MRIs to show an improvement , not a lack of degeneration." Id. (emphasis in original). According to the Magistrate Judge, this requirement imposes no burden of proof on the defendant, but is instead a logical inference that the court may make (in its de novo review) based on a specific set of facts. Dkt. # 33 at 40 (citing Reetz v. Hartford Life & Accident Ins. Co. , 294 F.Supp.3d 1068, 1079 (W.D. Wash. 2018) (citing Schramm v. CNA Fin. Corp. Insured Grp. Ben. Program , 718 F.Supp.2d 1151, 1162 (N.D. Cal. 2010) ) ) ).
In its de novo review of the R & R, the Court has located Sixth Circuit cases involving an abuse of discretion standard which stand for the proposition that "it is reasonable to require a plan administrator who determines that a participant meets the definition of 'disabled,' then reverses course and declares that same participant 'not disabled' to have a reason for the change; to do otherwise would be the very definition of arbitrary and capricious." Morris v. Am. Elec. Power LTD Plan , 399 Fed. Appx. 978, 984 (6th Cir.2010) (also stating "it does not follow, however, either logically or from our decision in Kramer , that the explanation [for the termination of benefits] must be that the plan administrator has acquired new evidence demonstrating that the participant's medical condition has improved"); see also Kramer v. Paul Revere Life Ins. Co. , 571 F.3d 499, 507 (6th Cir.2009). Both cases involved terminations under the same standard by which the claimant's disability was evaluated. Here, the Court finds Defendant's previous payment of benefits under the same definition of "disability" is a relevant consideration in the Court's de novo review.
As noted above, this language does not impose a burden of proof on a defendant, but rather demonstrates a logical inference that a court may make based on a specific set of facts. As set forth and applied by the Magistrate Judge, in reviewing the administrative record, the Court evaluates the persuasiveness of each party's case, which necessarily entails making reasonable inferences where appropriate. Plaintiff, however, carries the ultimate burden to prove that she was disabled under the terms of the Policy. See Schramm , 718 F.Supp.2d at 1162.
Defendant relies on Hilton v. Ashland Oil Inc. , 103 F.3d 124, 1996 WL 731358 (5th Cir. 1996) (unpublished), asserting the Magistrate Judge shifted the burden of proof from Plaintiff to Defendant despite her "lip service" to the burden of proof. See Dkt. # 37 at 7. Hilton is easily distinguishable. In that abuse of discretion case, the Fifth Circuit Court of Appeals reversed the judgment of the district court to the extent it held the plan administrator abused its discretion in concluding the claimant had not shown he came within the plan's definition of disability. 1996 WL 731358, *1.
According to the appellate court, despite it being the claimant's burden of supporting *1041 his asserted disability with medical evidence, Prudential attempted to obtain medical information from the claimant's physician and vocational reports regarding the claimant's workers' compensation claim. Id. at *4. "Scant as it was," Prudential was able to obtain some information which indicated, among other things, "[t]here was about an 80 percent chance that we can get [Hilton] over this without surgery." Id. Although Prudential attempted to get specific information from the claimant's treating physician, "the claims administrator received no additional information from that physician or from Hilton." Id.
"Having nothing before her but the meager results of her own voluntary efforts to do Hilton's evidence-gathering job for him, the claims administrator recommended denial of Hilton's claim for failure to meet his burden of supplying acceptable evidence in support of the Plan's 'any occupation' definition of disability." Id. "That recommendation was based on Prudential's inference, from the little evidence that was available, of the 'possibility' of Hilton's being retained for sedentary work, coupled with the levels of his education and prior work experience, and the dearth of medical evidence that he could not perform or be re-trained to perform the work required for any occupation." Id.
On appeal, the Fifth Circuit noted the plain wording of the plan "expressly placed on Hilton-as the party claiming to be disabled, and thus entitled to benefits-the burden of proving (i.e., submitting credible and probative medical evidence satisfactory to the Plan ), that he was in fact disabled to that extent." Id. at *5 (emphasis in original). Although the Fifth Circuit acknowledged the district court's "talismanic recitation" regarding the abuse of discretion standard was correctly recited, the district court's own opinion demonstrated that "in actuality" the court had "shifted the burden of proof from Hilton to the plan administrator" and had applied the clear error standard of review to the plan administrator's determination rather than the substantially more deferential abuse of discretion standard. Id. at *6. According to the Fifth Circuit,
[o]ur synopsis of the facts found by the district court and present in the record reflects a cavalier attitude and lackadaisical effort on Hilton's part regarding the submission of probative evidence sufficient to support a determination that despite his education, training, and experience, he could not perform any job or be re-trained to do so. Indeed, the slight evidence before the plan administrator at the time the decision was made had been assembled thanks to the efforts of the claims administrator and her persistence in badgering physicians and the compensation carrier for additional information. Even with the luxury of two extensions of 30 days, neither Hilton nor his counsel produced positive evidence of the kind needed to meet the test of disability under the Plan.
Id. (emphasis in original). The claimant essentially presented no evidence in support of his claim. Id. at *8.
Unlike in Hilton , Plaintiff presented significant evidence in support of her claim. As previously noted, the Agreed Administrative Record comprises 2,266 pages. The Court finds Defendant's arguments regarding outdated records and about the burden of proof without merit.
Whether the R & R errs in applying the treating physician rule and giving deference to Plaintiff's treating physicians over independent reviewing physicians and whether the R & R improperly relies on caselaw from outside the Fifth Circuit
The next sub-argument raised by Defendant in support of its first main objection *1042 is the R & R errs by applying the treating physician rule applicable in Social Security cases and giving deference to Plaintiff's treating physicians over independent reviewing physicians.[9] In its consideration of this sub-argument, the Court will also consider Defendant's second main objection to the R & R, that the Magistrate Judge relied on law outside this circuit "that is contrary to the way the Fifth Circuit will decide these issues." Dkt. # 37 at 20-22. As a general matter, Defendant asserts the R & R erred in using Ninth Circuit law and in specifically relying on Reetz v. Hartford Life & Accident Ins. Co. , 294 F.Supp.3d 1068 (W.D. Wash. 2018), a district court order within the Ninth Circuit "that no party here cited in their briefs or oral argument" and that the Magistrate Judge did not present to the parties prior to the issuance of the R & R.[10] Dkt. # 37 at 21.
Specifically in the context of its sub-argument regarding the so-called treating physician rule, Defendant also objects to the R & R's reliance on Reetz , see ids="12523740" index="75" url="https://cite.case.law/f-supp-3d/294/1068/#p1079">id. at 2-5 & 21, asserting the Reetz court improperly relied on the treating physician rule.[11] According to Defendant, nothing about de novo review changes that ERISA does not require plan administrators to accord special deference to opinions of treating physicians. Dkt. # 37 at 3 (citing Ariana M. II , 2018 WL 4384162, at *16 (recognizing on de novo review that "[p]recedent forecloses th[e] argument" that treating physicians' opinions are owed greater deference than the reviewing physicians) ).
As an initial matter, it is not improper for the Magistrate Judge to rely on the reasoning of an opinion neither party cites in its briefing. The Magistrate Judge found Reetz , a case involving Defendant, similar to the facts in this case and persuasive.[12] Contrary to Defendant's assertion, both the R & R, and the Reetz case on which it relies, specifically rejected the application of Social Security's treating physician rule. See Dkt. # 37 at 50-51; see also Reetz , 294 F.Supp.3d at 1083. In her discussion of the Reetz case, the Magistrate Judge stated there is no treating physician preference in the ERISA context. Id. (citing Black & Decker Disability Plan v. Nord , 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003) ). However, as stated by the court in Reetz , the Magistrate Judge noted "this does not mean that *1043 a district court, engaging in a de novo review, cannot evaluate and give appropriate weight to a treating physician's conclusions, if it finds these opinions reliable and probative." Dkt. # 33 at 51 (citing Reetz , 294 F.Supp.3d at 1083 (quoting Paese v. Hartford Life & Accident Ins. Co. , 449 F.3d 435, 442 (2d Cir. 2006) ) ).
Because Defendant asserts in its objections that the R & R's recommended findings of fact and conclusions of law regarding Plaintiff's treating physicians are the "lynchpin of the Magistrate Judge's recommendation" that Plaintiff meets the Policy definition of "disability," the Court takes a close look at the law regarding the weight to be given treating physicians in the ERISA context. Defendant argues nothing about de novo review changes precedent "which states that in an ERISA case, the court is not to apply the treating physician rule applicable in Social Security cases, where the opinion of a treating physician is entitled to more weight than that of non-treaters." Dkt. # 37 at 2-3. According to Defendant's interpretation of current law, the Court must "look at this in the same way that the administrator is required to look at the evidence in the AR, which provides no deference to the treating physician." Id. at 4. Stated differently, Defendant asserts "the case law is contrary to the R & R's finding that it can give more weight to a treating physician's conclusions in de novo review." Id. (emphasis added).
The Supreme Court, in Black & Decker Disability Plan v. Nord , held that in ERISA cases, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). Therefore, as urged by Defendant and specifically stated by the Magistrate Judge, Defendant was not required to give more weight to the opinions of Plaintiff's treating physicians than the two physicians it hired to review the file.[13]
To say "courts have no warrant to require plan administrators automatically to accord special weight to the opinions of a claimant's physician" does not mean that an administrator is prohibited from providing any "deference to the treating physician" or, more importantly, that a court cannot give appropriate "weight to a treating physician's conclusions in de novo review," as advocated by Defendant. See Dkt. # 37 at 4; see also Black & Decker , 538 U.S. at 834, 123 S.Ct. 1965. In Paese , the Second Circuit Court of Appeals explained as follows:
As for the specific issue of whether the district court gave undue weight to the conclusions of Paese's treating physicians, ...the Supreme Court has explicitly stated that, unlike the SSA, ERISA
*1044 Plan administrators need not give special deference to a claimant's treating physician. See Black & Decker Disability Plan v. Nord , 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003) ('[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.'). However, the Court in Black & Decker also observed that ERISA Plan administrators 'may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician.' Id. Accordingly, while Black & Decker holds that no special deference is required, this does not mean that a district court, engaging in a de novo review, cannot evaluate and give appropriate weight to a treating physician's conclusions, if it finds these opinions reliable and probative. This is precisely what happened here.
449 F.3d at 442.
Defendant's arguments about the Magistrate Judge's evaluation of the treating physicians' opinions as well as the opinions of the physicians relied upon by Defendant, fail to sufficiently account for the differences in the two standards of review. "In this case, as in many similar ERISA cases, selecting the standard of review is much more than a mere technicality." Turner v. Ret. & Ben. Plans Comm. Robert Bosch Corp. , 585 F.Supp.2d 692, 696 (D.S.C. 2007). Again, the de novo standard of review allows the court to examine all of the evidence in the record and decide whether or not the plaintiff in a case is totally disabled without giving any deference to the plan administrator's decision to deny or terminate disability benefits.[14] Id. (citing Quesinberry v. Life Ins. Co. of North America , 987 F.2d 1017, 1025 (4th Cir.1993) ).
As previously stated, in a trial on the administrative record under a de novo review standard, the court "can evaluate the persuasiveness of the conflicting testimony and decide which is more likely true." Kearney , 175 F.3d at 1095. The court's evaluation of the evidence " 'necessarily entails making reasonable inferences where appropriate.' " Oldoerp , 12 F.Supp.3d at 1251 (quoted source omitted). And, as held by the Second Circuit Court of Appeals, the court may give appropriate weight to the conclusions of a physician upon finding the physician's opinions reliable and probative. Paese , 449 F.3d at 442. This does not run afoul of the Supreme Court's decision in Black & Decker . Nor does it run afoul of Fifth Circuit precedent.
The Turner court's de novo review of the evidence is similar to that of the Magistrate Judge here. There, the court found the weight of all the evidence in the record indicated the plaintiff was, in fact, totally disabled. 585 F.Supp.2d at 707. After discussing Black & Decker , the court stated as follows:
It was certainly not erroneous, therefore, for MetLife to refuse to give more weight to the opinions of Plaintiff's treating physicians than the three physicians it hired to review the file.
However, the undeniably conspicuous fact is that, according to the record, the physicians who have treated the Plaintiff *1045 conclude that she is totally disabled and unable to pursue gainful employment. The only physicians who have concluded that Plaintiff is in fact not disabled and able to work are the three doctors hired by MetLife, who based their assessment on the Plaintiff's medical records. The court certainly has no medical expertise, and in no way questions the competency or objectivity of the physicians retained by MetLife, but it is simple common sense that there is information that a doctor may receive from hands-on treatment and interpersonal interaction with a patient that simply cannot be transmitted on a piece of paper. This proposition is amply supported by case law. See, e.g. , Oliver v. Coca Cola Co. , 497 F.3d 1181, 1196-97 (11th Cir.2007) (holding that there was no 'reasonable basis' for terminating benefits based solely on having file reviewed by physician where plaintiff had submitted voluminous medical evidence of disability based on years of visits with treating physicians); Evans v. UnumProvident Corp. , 434 F.3d 866, 877 (6th Cir.2006) (giving more weight to medical opinions based on physical examinations than opinions based solely upon file review).
For this reason, the court finds the opinions of the physicians who believe Plaintiff to be totally disabled to be more persuasive than the physicians whose opinions were relied upon by MetLife.
Id. In the interests of clarity, the court emphasized it did not find these physicians more persuasive simply because they were the plaintiff's treating physicians. Id. at n. 9. Instead, the court found their opinions more persuasive "for the simple fact that they have more information upon which to base such opinions than physicians who only have the benefit of a written record." Id.
Similar to the Turner court, and the court in Reetz , the Magistrate Judge stated the treating physicians' relationships with Plaintiff allowed them to personally observe the effects of Plaintiff's diagnoses and assess the credibility of her reports of pain. Dkt. # 33 at 51. As one example, the Magistrate Judge stated Dr. Gajraj, Plaintiff's pain management treating physician for over five years, opined in 2017 that Plaintiff suffers from chronic pain, secondary to lumbar degenerative disc disease /radiculopathy, and is disabled.[15] AR
*1046 14. In contrast, the Magistrate Judge noted Dr. Lewis, because he did not personally examine Plaintiff, could not have observed the effect of Plaintiff's chronic pain or assessed her credibility. And, as will be discussed in further detail below, the Magistrate Judge also specifically addressed the aspects of Dr. Lewis' report she found troubling.
As in Reetz , the Magistrate Judge found the treating physicians' medical opinions to be more reliable and probative of Plaintiff's condition than Dr. Lewis' report. Dkt. # 33 at 51 (citing Reetz , 294 F.Supp.3d at 1083 (citing Oldoerp , 12 F.Supp.3d at 1250 ("[W]hen an in-person medical examination credibly contradicts a paper-only review conducted by a professional who has never examined the claimant, the in-person review may render more credible conclusions.") ) ). In the absence of specific guidance from the Fifth Circuit to the contrary, the Court does not find the Magistrate Judge's evaluation of the evidence, or her conclusions, in error.[16]
Under a de novo review, the court may evaluate the opinions of the treating providers according to multiple factors. Barbu v. Life Ins. Co. of N. Am. , 35 F.Supp.3d 274, 289 (E.D.N.Y. 2014) (stating that "[a]lthough one factor could be whether the particular functional measurements cited by defendants' reviewers support plaintiff's disability claim, the Court need not follow defendants' reviewers in making those measurements (and how current they are) the primary basis of its decision"). According to the court in Barbu , the court may consider a range of evidence, to include objective testing and subjective reports of symptoms. 35 F.Supp.3d at 289 (citing Connors v. Connecticut General Life Ins. Co. , 272 F.3d 127, 136 (2d Cir. 2001) ("It has long been the law of this Circuit that the subjective element of pain is an important factor to be considered in determining disability.") (internal quotation marks and citations omitted) ) ). As the Supreme Court has instructed, "when judges review the lawfulness of benefit denials, they will often *1047 take account of several different considerations ... determin[ing] lawfulness by taking account of several different, often case-specific, factors, reaching a result by weighing all together." Barbu , 35 F.Supp.3d at 289 (quoting Metro. Life. Ins. Co. v. Glenn , 554 U.S. 105, 117, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008) ).
Here, the Magistrate Judge took into account several different considerations - the opinions of Plaintiff's treating physicians and Defendant's independent reviewing physicians, Dr. Sklar and Dr. Lewis, as well as Plaintiff's subjective elements of pain - and reached a result in Plaintiff's favor by weighing all together. The Court finds without merit Defendant's objections regarding the "treating physician rule" and the weight the Magistrate Judge gave to Plaintiff's treating physicians' opinions. The Court also overrules Defendant's objection that the Magistrate Judge erred in relying on law outside this circuit.
The Court now considers whether the Magistrate Judge erred in her consideration of the opinions of Dr. Sklar and Dr. Lewis. In its reply to Plaintiff's response to its objections, Defendant asserts the "R & R picks at Dr. Lewis's and Dr. Sklar's opinions but fails to acknowledge that these independent reviewing physicians grappled with Plaintiff's functionality, which is the standard under the [Policy]," and fails to properly credit these physicians "for accounting for and reconciling all the evidence in the AR." Dkt. # 40 at 3.
The R & R devoted five pages of analysis to explaining why she deemed Dr. Lewis' and Dr. Sklar's opinions less reliable and thus accorded them less weight. Dkt. # 33 at 48-52. Relying on Fifth Circuit law, the Magistrate Judge addressed why she gave Dr. Sklar's conclusions, which she believed contradicted those of Plaintiff's treating physicians, minimal weight:
The records reveal[ ] that since 2002, Plaintiff has consistently reported that she experienced pain. Rather than showing improvement of Plaintiff's condition, Dr. Skylar's IME Report supports Plaintiff's position. On physical examination, Dr. Sklar noted Plaintiff walked with a forward flexed posture holding her back, and she had decreased sensation in the bilateral lower extremities especially in the S1 distribution. He also noted '[s]traight leg raising to 90 degrees in the seated position cause[d] complaints of back pain.' AR 1529. There was also moderate tenderness to palpation over the lumbosacral junction and bilateral gluteals and left lateral thigh/greater trochanter region. Dr. Sklar stated the physical examination was consistent with the diagnosis of chronic unspecified lower back pain. However, according to Dr. Skylar, there was no 'clear evidence of any persistent radiculopathy and records [were] not consistent with the diagnosis of chronic radiculopathy either.' AR 1529. Dr. Skylar acknowledged Plaintiff has pain but did not believe pain could or should preclude a claimant from working.
However, pain can either prevent or make difficult the tasks required by an occupation. See Audino v. Raytheon Co. Short Term Disability Plan , 129 Fed. Appx. 882, 885 (5th Cir.2005) ('We are also troubled by MetLife's failure to accord weight to Audino's consistent complaints of pain, even though those complaints were documented in her medical records for years before she sought benefits and there is no indication that she overstated her pain once she decided to seek benefits.'); see also Schexnayder v. CF Indus. Long Term Disability Plan for its Employees , 553 F.Supp.2d 658, 666-67 (M.D. La. 2008), aff'd in part, rev'd in part sub nom.
*1048 Schexnayder v. Hartford Life & Acc. Ins. Co. , 600 F.3d 465 (5th Cir. 2010) ('Although pain cannot always be objectively quantified, Mr. Shexnayder's pain is corroborated by medical evidence finding degenerative disc disease and spinal stenosis and notations of pain in the results of the FCE. The Defendant abused its discretion in discounting the subjective evidence of Plaintiff's pain and the objective evidence corroborating the disability.').
Dkt. # 33 at 49-50.
In Audino , relied upon by the Magistrate Judge, the Fifth Circuit found an abuse of discretion because the plan administrator ignored the claimant's consistent complaints of pain as subjective, "either minimized or ignored objective evidence of disability corroborating those complaints, and concluded that the evidence did not show an inability to do her job functions without analyzing the effect that her conditions would have on her ability to perform her specific job requirements." 129 Fed. Appx. at 885. In that case, the claimant presented specific evidence of misstatements and oversights by the reviewing physicians that the plan administrator relied upon in denying the claim. Id. at 884-85 (noting that one physician misstated objective test results, while another mentioned exam results in a summary of evidence but failed to discuss those results in analysis of whether claimant was disabled).
According to Defendant's objections, the Audino case is distinguishable because there, in determining whether the claimant could meet an own occupation definition for short term disability benefits, the employer provided a list of the tasks the claimant would be required to do in her specific job, and the defendant did not analyze the effect of her medical condition on those specific tasks. See Dkt. # 37 at 14, n. 10. Defendant asserts it did that analysis with the EAR and EAR addendums.[17] Defendant argues Plaintiff has presented no evidence in the AR to contradict the final EAR and its analysis of whether she can meet the requirements of the Policy's "any occupation" standard. Id.
However, as set forth by the Magistrate Judge, there is evidence in the AR that contradicts the final EAR (i.e. records from Plaintiff's treating physicians and evidence regarding Plaintiff's chronic pain and the effects of her pain medication). Additionally, similar to the Fifth Circuit in Audino , the Magistrate Judge found deficiencies in the opinions of the medical consultants. According to the Magistrate Judge, the First EAR Addendum relied upon Dr. Sklar's IME Report. Thus, the Magistrate Judge concluded the First EAR Addendum may not have accurately returned jobs that could be performed by Plaintiff.[18] Dkt. # 33 at 54 (quoting *1049 Reetz , 294 F.Supp.3d at 1085 ) ("In short, the [C]ourt finds that the search did not accurately reflect [Plaintiff's] limitations, and thus, the [C]ourt is not convinced that the jobs returned by the search are ones that [Plaintiff] can perform.").
In asserting the R & R errs in not giving deference to its independent reviewing physicians, Defendant relies on Anderson v. Cytec Indus., Inc. , 619 F.3d 505, 515 (5th Cir. 2010), wherein the Fifth Circuit stated the fact the "independent experts reviewed Anderson's records but did not examine him personally also does not invalidate or call into question their conclusions." See Dkt. # 37 at 21. The fact that Dr. Lewis did not examine Plaintiff in person was not what called into question his conclusions. Rather, the mistakes contained in Dr. Lewis' report called into question the reliability of his conclusions.
The Magistrate Judge noted two times in his report Dr. Lewis stated Plaintiff's L4-L5 and L5-S1 surgery was performed in 2012, rather than 2002. Id. at 52 (citing AR 1343, 1348). In both instances, Dr. Lewis stated Plaintiff "previously" underwent surgery on L3-4 on March 25, 2008. According to the Magistrate Judge, this belies Defendant's argument that Dr. Lewis' report had a "typographical error on [the] surgery date being 2012." Dkt. # 33 at 52 (quoting Dkt. # 26 at 27). The Magistrate Judge noted other errors as well. For example, Dr. Lewis states Plaintiff continued to utilize the spinal cord stimulator, but the record reveals the stimulator was surgically removed in 2012 because it caused an increase in Plaintiff's symptoms. Dkt. # 33 at 52 (citing AR 1343). Ultimately, the Magistrate Judge gave little weight to Dr. Lewis' opinion.
The Court finds Defendant's objections regarding the Magistrate Judge's treatment of the independent medical reviewers' opinions without merit.
Whether the R & R wrongly relies on Plaintiff's subjective complaints as opposed to objective evidence
In its next sub-argument, Defendant asserts the R & R erroneously relies on Plaintiff's subjective complaints as opposed to objective evidence. According to Defendant, the R & R faults Defendant for not factoring in her cognition even though it considered all of the medical and other evidence, including Plaintiff's lengthy and detailed letters and questionnaires which it asserts undermine her complaints of cognitive impairment. Dkt. # 37 at 12. Defendant argues Dr. Sklar and Dr. Lewis considered Plaintiff's subjective complaints of pain and the effects of her medications and concluded the objective medical evidence was more probative, "something that the Fifth circuit has previously acknowledged is appropriate for an administrator." Id. at 13 (citing Corry v. Liberty Life Assurance Co. of Boston , 499 F.3d 389, 400-03 (5th Cir. 2007) ).
In her response, Plaintiff argues Defendant cannot credibly argue she does not suffer from chronic pain, pointing out Defendant's own IME physician, Dr. Sklar, stated the "claimant has pain" and also *1050 that "pain is clearly not a reason not to work." Dkt. # 38 at 6. Plaintiff further asserts as follows:
Hartford cannot credibly argue that the record does not contain extensive, objective evidence supporting Pike's subjective complaints. The R & R references Pike's diagnostic lumbar discogram10, MRI demonstrating instability at L3-4, extreme interbody fusion at L3-4, CT scan, x-ray, MRI, and nerve conduction study, failed surgical spinal stimulator, and Sudoscan. The R & R weaves its consideration of these objective tests with the opinions and conclusions of multiple treating physicians over the course of many years.
In truth, Hartford's 'objection' is nothing more than its complaint that the R & R did not improperly defer to its claim determination.... Hartford forgets that in a de novo review, 'What happened before the Plan administrator or ERISA fiduciary is irrelevant.' ... The fact that Hartford's conclusion on the evidence at the claim stage differed from that of the Magistrate at trial does not make the Magistrate's conclusion erroneous.
Id. (citations omitted).
In its objections and reply, Defendant relies on two Fifth Circuit cases in which the Fifth Circuit held the administrator did not abuse its discretion by failing to give adequate weight to the claimant's complaints of pain. See Dkt. # 37 at 13 (citing Corry ); see also Dkt. # 40 at 3 (citing McDonald v. Hartford Life Grp. Ins. Co. , 361 Fed. Appx. 599 (5th Cir. 2010) ).[19] In McDonald , the Fifth Circuit discussed both Audino (discussed above) and Corry in detail. 361 Fed. Appx. at 612. Importantly, all three cases involved the abuse of discretion standard of review, which considers whether the administrator acted arbitrarily or capriciously.[20]
In Corry , the Fifth Circuit addressed in detail whether an administrator's review adequately considered a claimant's subjective complaints of pain. McDonald , 361 Fed. Appx. at 612 (citing Corry , 499 F.3d at 399-401 ). There, the claimant's experts opined she was disabled due to fibromyalgia, a diagnosis reached by reliance on the claimant's subjective reports of pain. McDonald , 361 Fed. Appx. at 612 (citing Corry , 499 F.3d at 401 ). The plan administrator rejected the claimant's assertion that she was disabled, relying on the opinions of three outside reviewing physicians. Id. "All three reviewing physicians discussed the claimant's subjective complaints and her previous diagnosis of fibromyalgia in *1051 their analyses; yet they each ultimately concluded that no medical evidence existed establishing a disability." Id. On appeal, the Fifth Circuit concluded that this constituted a "battle of the experts," where the administrator was "vested with discretion to choose one side over the other." Id. Therefore, the court rejected the argument that the administrator "fail[ed] to consider and give proper weight to relevant evidence" of subjective pain. Id.
In McDonald , the Fifth Circuit held Hartford and its reviewing physicians clearly "considered, evaluated, and addressed" the claimant's subjective complaints of pain "but ultimately concluded that these subjective complaints were insufficient to support a finding of disability." 361 Fed. Appx. at 612-13. According to the Fifth Circuit in McDonald , any "difference of opinion between the reviewing and treating physicians on the interpretation of [the claimant's] MRIs falls into Hartford's area of discretion; McDonald [did] not point to any affirmative misstatements of objective test results of the kind presented in Audino ." Id. at 613. The court emphasized Hartford had "discretion in this battle of experts, and in the absence of evidence that Hartford failed to consider McDonald's complaints of pain, Hartford was within its discretion to accept the opinions of its three qualified medical experts." Id. The court concluded Hartford's decision was neither arbitrary nor capricious on this point.
A review of the McDonald case again brings the issue of the standard of review into focus. Unlike the abuse of discretion standard applied in McDonald , and in Audino and Corry cited therein, here the Magistrate Judge and this Court apply a de novo review. In independently weighing the evidence, the Magistrate Judge gave minimal weight to Dr. Sklar's opinions, explaining in detail the reasons why. See Dkt. # 33 at 48-50. She also found troubling certain aspects of the report of Dr. Lewis, and thus gave it minimal weight. Id. at 51. The Court finds the Magistrate Judge did not improperly consider subjective complaints over objective evidence. This objection is overruled.
Whether the R & R erroneously uses Plaintiff's attorney's arguments in briefing as findings
In its next sub-argument, Defendant asserts the R & R erroneously uses Plaintiff's attorney's arguments in briefing as findings. Specifically, Defendant criticizes the Magistrate Judge's discussion of whether the errors contained in Dr. Lewis' report, which Defendant characterized as merely typographical, changed the conclusions in the report. In her discussion, the Magistrate Judge noted Plaintiff's argument as to why the errors are important: "According to Plaintiff, it is important that Plaintiff's L4-S1 surgery predates her L3-4 surgery because "that suggests that she is suffering from Transitional Syndrome, where the prior fusion causes increased stress on adjacent levels" and also implies 'possible further deterioration in the future.' " Dkt. # 33 at 52 (quoting Dkt. # 17 at 27). Defendant argues the Magistrate Judge never identifies any impact in the AR that "typographical errors" have on Dr. Lewis' conclusions. Dkt. # 37 at 17.
As noted above, the Magistrate Judge set forth several errors contained in Dr. Lewis' report that called into question the reliability of his conclusions. The errors were not just limited to what Defendant characterizes as "typographical." Specifically, Dr. Lewis believed Plaintiff's 2008 L3-4 surgery occurred prior to her 2002 L4-S1 surgery; Plaintiff's 2009 surgery was to remove hardware from the L3-4 surgery; Plaintiff continues to use the spinal cord stimulator and it provides some relief; Plaintiff underwent L4-S1 surgery *1052 in 2012, and improved post-operatively; Plaintiff reports no adverse medication side effects; and Defendant's surveillance shows physical activity inconsistent with Plaintiff's report. The Court does not find the Magistrate Judge erroneously uses Plaintiff's attorney's arguments in briefing as findings or that any such findings lead to erroneous legal conclusions.
Defendant also criticizes the Magistrate Judge's brief discussion regarding the Social Security Administration's ("SSA") determination that Plaintiff remains disabled under its standards. See Dkt. # 33 at 54-55 (stating the SSA determination was also relevant to the Court's de novo review and further stating "[t]he SSA's determination that Plaintiff remains Totally Disabled under its standards, as of April 10, 2017, is further evidence [of Disability under the Plan]."). At the end of her discussion after considering the pertinent medical evidence, the Magistrate Judge noted that although not binding, the SSA determination was also relevant to her determination on de novo review. See Dkt. # 33 at 54 (citing Gellerman v. Jefferson Pilot Fin. Ins. Co. , 376 F.Supp.2d 724, 735 (S.D. Tex.2005) (noting that "no court has held that an SSA determination is completely irrelevant") ).
In April 2009, Plaintiff reported she had been awarded social security disability benefits. Dkt. # 33 at 10, n. 10 (citing AR 959, 961, 1361, 2059). The AR contains a letter dated April 10, 2017. AR 1361. Although it states the SSA had previously sent Plaintiff a letter telling her it was going to review her disability case, it did not need to review the case after all and would not be contacting her doctor. Id. According to Defendant, the letter says nothing about Plaintiff remaining "Totally Disabled under the SSA's standards."
Defendant argues the "regulations make clear that the SSA might waive its disability review for a wide variety of reasons, including based on its capacity for case reviews, backlog of pending reviews, projected number of new applications, and projected staffing levels." Dkt. # 37 at 20. Defendant further argues the SSA award with a physical assessment and "current evaluation" dated March 13, 2009 (AR 752-759), has no relevancy to whether Plaintiff is disabled as of December 15, 2016. Id. at 21. According to Defendant, "by nature of the date, it is based on outdated records and involves a time period for which Hartford already paid benefits." Id.
In her response, Plaintiff argues the 2017 letter ended the continuing disability review, rather than waived it, as asserted by Defendant. Dkt. # 38 at 9. Plaintiff further argues the letter suggests the SSA "collected evidence from her, and then decided it was no longer necessary to review her claim." Id. at 10. According to Plaintiff, the reasonable inference from the AR is the SSA continued to consider Plaintiff to be disabled under its rules.
As one of the many considerations she considered in her de novo review, the Magistrate Judge simply noted it is also of some relevance to the inquiry that the SSA judged Plaintiff to be disabled and awarded her disability benefits in 2009. Defendant does not dispute Plaintiff continues to receive social security disability benefits. The Court is not convinced the R & R erred in this regard and thus overrules Defendant's objection.
Whether the R & R "cherry-picks" from the AR instead of reconciling the evidence
Nor is the Court persuaded the R & R improperly "cherry picks" from the AR instead of reconciling the evidence, as Defendant argues in its last sub-argument. The Magistrate Judge explained in detail why she found some evidence more probative *1053 and some evidence less probative. This last objection is also overruled.
Discussion of the third main objection
At the end of the R & R, the Magistrate Judge considered whether pre-judgment interest, costs, and attorney's fees should be awarded as requested by Plaintiff in her Original Complaint. The Magistrate Judge found Plaintiff is entitled to receive LTD benefits from December 15, 2016, and to recover pre-judgment interest on those unpaid benefits. Id. at 56. She also found the circumstances support an award to Plaintiff for attorney's fees and costs, in addition to the benefits amount owed to her under the Policy. Id. at 59. Rather than specifically recommend an award of fees and costs, the Magistrate Judge recommended that Plaintiff be directed to file, within twenty days from the date of any Order adopting the R & R, a motion for pre-judgment interest, costs and attorney's fees. Id.
In its final objection, Defendant asserts any purported findings in support of the R & R's conclusions regarding attorney's fees and costs should not be adopted. According to Defendant, Plaintiff has not moved for or met her burden of showing entitlement to fees under 29 U.S.C. § 1132(g)(1). Should that occur, Defendant reserves its rights to challenge the motion, both on the ability to recover fees and on the reasonableness of any recovery.[21]
The parties acknowledge the R & R anticipates further briefing on the issue. As acknowledged by Plaintiff in her response to Defendant's objections, the R & R specifies that any such award must be legally and factually supported and that Defendant is allowed to file a response. The Magistrate Judge specifically ordered Plaintiff's motion on attorney's fees shall include argument as to the authority upon which such fees may be granted. This Order clarifies the Court will consider de novo , following the parties' briefing, whether Plaintiff should be awarded pre-judgment interest, attorney's fees, and costs and if so, in what amounts.
CONCLUSION
With the above clarification regarding the issue of pre-judgment interest, attorney's fees, and costs, the Court is of the opinion the recommended findings and conclusions of the Magistrate Judge are correct. Defendant's objections are without merit as discussed more fully herein. Accordingly, it is hereby
ORDERED that the objections of Defendant are OVERRULED . It is further
ORDERED that Plaintiff's Motion for Judgment on the Record (Dkt. # 17) is GRANTED , and Defendant Hartford Life and Accident Insurance Company's Cross-Motion for Judgment on the Record (Dkt. # 25) is DENIED . It is further
ORDERED that within twenty days from the date of entry of this Order, Plaintiff shall file a motion regarding pre-judgment interest, costs, and attorney's fees. The motion should be legally and factually supported and should address the appropriate rate to be prescribed in the event the Court finds Plaintiff is entitled to recover pre-judgment interest on the unpaid LTD benefits from December 15, 2016 as indicated in the R & R. The motion should also be supported by evidence reflecting the reasonable amount of costs and fees sought, and shall include argument as to *1054 the authority upon which such fees may be granted. It is further
ORDERED that Defendant shall file a response in accordance with the Local Rules, and Plaintiff may file a reply in accordance with the same. If it so desires, Defendant may file a surreply.
IT IS SO ORDERED.
REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE
CAROLINE M. CRAVEN, UNITED STATES MAGISTRATE JUDGE
The above-referenced cause of action was referred to the undersigned United States Magistrate Judge for pre-trial purposes in accordance with 28 U.S.C. § 636. The parties have filed a stipulated administrative record and have submitted this matter to the Court for trial on the briefs. The following motions are before the Court:
Plaintiff's Motion for Judgment on the Record (Docket Entry # 17); and
Defendant Hartford Life and Accident Insurance Company's Cross-Motion for Judgment on the Record (Docket Entry # 25).
Having heard oral argument and having considered the materials submitted by the parties, the Court finds for Plaintiff under the following recommended findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).[1]
I. BACKGROUND
This Employee Retirement Income Security Act ("ERISA") action concerns the termination of Gina Pike's ("Plaintiff") long term disability ("LTD") benefits, pursuant to 29 U.S.C. § 1132 (a)(1)(B). Plaintiff seeks recovery of long term disability benefits under an ERISA-governed plan offered by her former employer and insured by Defendant Hartford Life and Accident Insurance Company ("Defendant" or "Hartford"). Hartford paid Plaintiff's claim for LTD benefits from April 24, 2008 through December 14, 2016, the period of time when Hartford determined Plaintiff met the definition of "disability" in the policy. However, after later determining Plaintiff was unable to prove she continued to be "disabled" under the policy, Hartford discontinued LTD benefits effective December 15, 2016. The issue then is whether Plaintiff is entitled to receive LTD benefits after December 14, 2016 under the applicable policy.
Plaintiff alleges she is entitled to recover under the civil enforcement provisions of ERISA, specifically 29 U.S.C. § 1132 (a)(1)(B) and 29 U.S.C. § 1133.[2] Docket Entry # 1 at 2. Plaintiff seeks the benefits she has been denied plus pre-judgment and post-judgment interest, recovery of *1055 attorney's fees and costs, clarification of her right to receive future benefits under the policy, and any other appropriate equitable relief. Docket Entry # 1 at 3.
The parties have filed cross motions for judgment on the record as well as the administrative record compiled by Hartford during the administration of Plaintiff's claim (the "Agreed Administrative Record").[3] The Court's findings and conclusions are based upon the Agreed Administrative Record. Abate v. Hartford , 471 F.Supp.2d 724, 732 (E.D. Tex. 2006) ("Generally, a plaintiff suing under ERISA is limited to the administrative record that was before the plan administrator."); see also Cooper v. Hewlett-Packard Co. , 592 F.3d 645, 657-58 (5th Cir. 2009) (same); see also Ariana M. v. Humana Health Plan of Texas, Inc. , 884 F.3d 246, 257 (5th Cir. 2018) (stating that changing the standard of review for factual determinations to de novo does not require the court to alter its precedent concerning the scope of the record in ERISA cases and further stating " Vega will continue to provide the guiding principles on the scope of the record for future cases that apply de novo review to fact-based benefit denials").[4]
Plaintiff's medical history, as well as the facts behind Hartford's termination of LTD benefits, are long and complex. The following constitutes the relevant facts based on the Agreed Administrative Record.
II. RECOMMENDED FINDINGS OF FACT
A. Hartford's Policy
Hartford issued an insurance policy, identified as Hartford policy number GLT-675193 ("the Policy"), effective January 1, 2005, describing benefits effective July 1, 2016 to Plaintiff's employer, Gambro, Inc. Exhibit A to Plaintiff's Motion for Judgment on the Record (Docket Entry # 17-1); AR 2036-2037. Plaintiff is insured for LTD benefits under the Policy. The Policy does not grant discretionary authority to the Plan Administrator or the Claims Administrator.[5]
*1056 Under the Policy, a claimant is entitled to LTD benefits if she is "disabled" throughout and beyond the "Elimination Period" (the first 90 days of disability). Id. at 25-26. A claimant is "disabled" during the first 24 months if she is "prevented from performing one or more of the Essential Duties" of her "Own Occupation." Id. The Policy changes its definition of disability after 24 months' benefits have been paid. Thereafter, a claimant is "disabled" if she is "prevented from performing one or more of the Essential Duties" of "Any Occupation." Id. "Any Occupation" means any occupation for which the claimant is qualified by education, training or experience and that has an earnings potential greater than the lesser of the product of the claimant's "Indexed Pre-disability earnings and the Benefit Percentage;" or "the Maximum Monthly Benefit." Id. at 25.
"Essential Duty" means a duty that:
1) is substantial, not incidental;
2) is fundamental or inherent to the occupation, and
3) cannot be reasonably omitted or changed.
Id. at 26. A claimant's ability to work the number of hours in her regularly scheduled workweek is an "Essential Duty." Id.
B. Plaintiff's background
By January 2008, Plaintiff had worked for seventeen years as a microbiologist and had reached a supervisory level at her job. AR 467. As a microbiologist, Plaintiff was "responsible for writing all the documents sent to FDA for product submission;" she created reports and data and led the management review board meetings; she supervised the complaint and product released groups and was responsible for medical device recalls and microbiology investigations. AR 467.
Plaintiff had suffered from severe back pain since at least 2002, when a diagnostic lumbar discogram revealed severe pathology at her L4-5, L5-S1 intervertebral levels, as well as less severe degeneration at her L3-4 level. AR 507-08. Plaintiff underwent surgery in 2002 on her L4-S1 levels and improved for a time, but she began to deteriorate in 2004. AR 521, 533-34. By 2007, Plaintiff could not sit in a chair, lie in a bed, or stand for any significant length of time. AR 521. An examination at that time revealed her prior L4 to S1 fusion was stable, but she was experiencing transitional instability at her L3-4 level. AR 524. On March 25, 2008, Plaintiff underwent an extreme interbody fusion at L3-4. AR 787-89.
C. Plaintiff's LTD Claim
On March 28, 2008, Plaintiff applied for LTD benefits (the "LTD Claim") with Hartford. AR 971, 2037, 2261-62, 2253-57, and 2251. In the application, Plaintiff reported she was unable to continue working as a regulatory affairs group leader because of an interbody fusion surgery "needed due to degeneration of [her] spine at the L3-L4 vertebrae locations." AR 786, 2254. Plaintiff stopped working on January 24, 2008, but expected to return to work on July 31, 2008. AR 2254. Plaintiff sought LTD benefits to cover three to four months of post-surgery recovery time not covered by her employer Gambro's short term salary continuation, which would expire on April 28, 2008. AR 2037.
Along with the application, Plaintiff submitted an Attending Physician's Statement of Disability ("APS") dated March 28, 2008, and completed by Plaintiff's then-treating neurological surgeon Dr. Robert Martin. AR 2259-60 ("APS No. 1"). In APS No. 1, Dr. Martin confirmed Plaintiff underwent a L3-4 lateral interbody fusion on March 25, 2008 to treat lumbar/sacral instability and lower back pain. AR 2259. Dr. Martin placed specified physical restrictions *1057 and limitations on Plaintiff during the surgery recovery period. AR 2260. Dr. Martin also submitted records regarding the surgery and records of his pre-surgery office visits with Plaintiff that noted the reasons for the surgery (i.e. , Plaintiff had a history of low back pain; she underwent a spinal fusion in December 2002; the pain returned in 2004 and became unmanageable). AR 2077-2083 at 2082. Hartford also interviewed Plaintiff and memorialized her responses, which focused on her expected recovery, and confirmed Plaintiff's objective to return to work after she recovered from the surgery. AR 969.
D. Hartford approved the claim effective April 24, 2008
Based on APS No. 1, the medical records submitted by Dr. Martin's office, and Plaintiff's subjective statements regarding her post-surgery functionality, Hartford noted Plaintiff expected to return to work four months after the surgery. AR 968. However, that meant Plaintiff could not return to work until after the Elimination Period due to her post-surgery recovery, which limited Plaintiff from performing the physical tasks required for her occupation as a regulatory affairs group leader ("constant sitting, walking, stooping, kneeling and reaching"). AR 968. Finding Plaintiff unable to perform her "Own Occupation," Hartford approved the claim effective April 24, 2008. AR 1039-1042 (Letter dated April 26, 2008).
In December 2008, the LTD Claim was referred to Hartford's Special Investigations Unit ("SIU") for investigation because (1) "[Plaintiff] ... had multiple address changes," moving between homes in Florida and then from Florida to Texas; (2) "[Plaintiff's] telephone number was answered with a business name;" (3) per an Internet search, Plaintiff's name "may be attached to a business;" and (4) Plaintiff's self-reported limited functionality and that provided by Dr. Martin seemed inconsistent with the fact that Plaintiff and her husband moved to Texas to take care of her husband's mother. AR 1297-1301 (2008 SIU Case Report). Video surveillance was conducted during the investigation. Id. The investigation was later closed. Id.
Hartford continued to administer the LTD Claim and obtained updated medical information for Plaintiff. The information showed Plaintiff would take longer to recover from the March 2008 spinal fusion than the three or four months estimated by Dr. Martin. AR 964, 966. The information included an APS dated July 11, 2008, by then treating-neurological surgeon Dr. Martin ("APS No. 2");[6] an APS dated December 2008 by then treating-psychiatrist Dr. Nayan Patel ("APS No. 3");[7] and an APS dated November 17, 2009 by then-treating orthopedic surgeon Dr. Ralph Rashbaum ("APS No. 4").[8]
In response to her complaints of pain, Plaintiff's then-treating physicians confirmed Plaintiff's spinal fusion was healing properly and becoming solid and that her spine was structurally sound. They identified the cause of the pain as hardware inserted during the March 2008 spinal fusion that had loosened, then, a possible dysfunction in the sacroiliac joint (SI), and finally, nerve damage. See AR 955 (note from September 21, 2009, "CT results showed structurally the back was fine and the fusion was solid" but there was still pain that could be residual damage to the nerves from the hardware hitting the *1058 nerve or the original injury and further noting if it was nerve damage it could take 12-18 months to resolve "if at all"); AR 956 ("Saw Dr. Bosita [then-treating neurosurgeon] on 04/09/2009. xray revealed back looked good, but still experiencing pain.... Went to Texas Back Institute on 06/01/2009 and revealed she had permanent nerve damage from the screws."); AR 961 (note from February 12, 2009, "[Plaintiff] called to say she saw Dr. Bosita [then-treating neurosurgeon] today. an xray was done. the fusion getting more solid."); see also AR 824, 1429 (December 2008 x-rays); 2208 (referencing June 2009 MRI of lumbar spine ); 2211-2212 (August 2009 CT of lumbar spine); AR 963-64; 2215-2218 (July 16, 2009 sensory nerve conduction study ) (revealing "reduced recruitment and an increased proportion of high amplitude long duration MUAP's in the bilateral L5 myotomes").
Plaintiff's then-treating physicians prescribed joint injections to treat the SI dysfunction (she received the injections in November and December 2008); physical therapy; and surgery to remove the loosened hardware (she underwent the surgery in March 2009). AR 1992-97 (Letter dated January 19, 2010). Plaintiff still complained of pain. Between July 2008 and February 2010, Plaintiff updated Hartford regarding her recovery. During the calls and in the written communications, Plaintiff reported she was experiencing debilitating pain that prevented her from sitting, standing, and/or walking for any appreciable period of time. AR 949-50 (February 2010 call); 951 (December 2009 call); 952 (November 2009 calls and voicemail); 953-54 (October 2009 call); 955 (September 2009 calls); 961-62 (April 2009 call, February 2009 call and voicemail); 963 (December 2008 call); 964-65 (October 2008 call); 966 (July 2008 call); 1940-43 (questionnaire dated April 28, 2009); 2010-12 (Letter dated July 22, 2009); 2007-09 (Letter dated October 19, 2009); 1992-97 (Letter dated January 19, 2010).
Still complaining of pain, Plaintiff next sought treatment with Ralph F. Rashbaum, M.D. AR 2236. A June 1, 2009 consultation note with Dr. Rashbaum at the Texas Back Institute revealed Plaintiff had been having problems for eight years and was no longer able to walk for any distance or even shop. AR 2236. Plaintiff had a spinal cord stimulator implanted in December 2009 to help alleviate her pain.[9] AR 2237. Dr. Rashbaum's January 2010 record indicated Plaintiff was getting too much stimulation in her low back. AR 2237. The assessment included chronic pain, "failed back surgery syndrome, status post spinal cord stimulator and peripheral ANS stimulator." AR 2237. Plaintiff was taking four to five pain pills a day and four gabapentin per day.
By February 18, 2010, Plaintiff was still rating low back pain at a 7/10 sometimes approaching 10/10; leg pain 6/10 also approaching 10/10; and midback pain 5/10 that could escalate to 10/10. AR 2239. As before, Plaintiff produced "very specific charts and diagrams depicting her pain levels given various activities." It was noted Plaintiff was "always very cooperative with the exam and very gracious in her approach to her chronic pain condition." AR 2239. Plaintiff felt the permanent implant was not as effective as a trial device she had previously tried, and Dr. Rashbaum explained that it was doing everything that it could and that she still needed to "use every tool that she [could] to try to improve her life and reduce her pain." AR 2239. Although Plaintiff was managing on Norco"anywhere from 5 to 6," it was not *1059 "really accomplishing what she need[ed] for it to" so Dr. Rashbaum had a "long hard conversation" with Plaintiff. Specifically, Dr. Rashbaum advised Plaintiff as follows:
[S]he probably does need to try a class II medication.... I have told her in the past that she will more than likely always be on some form of pain medication, she wanted to avoid class II if possible. I think we have exhausted every other procedure and modality to try to prevent that. I am referring her now to Dr. Bernstein to see if he can find the right medication mix to help reduce her pain so that she can be more active. She wants to do so much, but is very limited physically. I have also provided her with a prescription for handicap parking placard that she can use. I think she pushes herself so far that she has been in such extreme pain that she is bedridden for 2 to 3 days.
AR 2239.
Plaintiff's care then transitioned to pain management physician Dr. Sidney Bernstein at the Texas Back Institute. AR 949 (Hartford noting it was unexpected Plaintiff would have the capacity to perform full time work on a regular basis due to inability to sit, stand or walk for minimum periods). Hartford continued to pay Plaintiff benefits through the end of the "Own Occupation" period on April 23, 2010.[10]
E. The April 24, 2010 change of definition of "disabled"
Given the LTD Claim was effective April 24, 2008, the definition of "disabled" changed under the Policy on April 24, 2010, from "Own Occupation" to "Any Occupation." AR 1030-31 (Letter dated October 29, 2009). Thus, Plaintiff was only entitled to LTD benefits beyond April 24, 2010 if she was unable to perform the essential duties of any occupation. Id.
F. Hartford's information regarding Plaintiff's functional capacity
To determine whether Plaintiff would be capable of performing any occupation, in October 2009 Hartford began to gather medical information regarding Plaintiff's functional capacity. AR 952. As requested, Dr. Rashbaum provided APS No. 4, which stated Plaintiff could not reach or perform fingering or handling. He provided no restrictions or limitations for sitting, standing, or walking. AR 1916-17. Hartford asked Dr. Rashbaum to specify his opinion on Plaintiff's ability to sit, stand, and walk. AR 944-45. Dr. Rashbaum sent an APS dated March 12, 2010, but it also provided no specific assessment of restrictive limitations, and instead annotated "Patient Unable to Work." AR 1914-15 ("APS No. 5").
Dr. Rashbaum later provided an APS dated April 20, 2010. AR 1909-10 ("APS No. 6"). APS No. 6 explained that Plaintiff could frequently reach at desk level and lift/carry up to ten pounds, but sitting, standing, or walking were all limited to fifteen or twenty minutes at a time, up to four hours total. AR 1909-10, 1912-13. On April 20, 2010, Dr. Rashbaum's office clarified that Plaintiff's functional capacity was limited to four hours a day.
On April 22, 2010, Hartford conducted an employability analysis (the first "EAR"), which evaluated whether there were any occupations Plaintiff was capable of performing based upon her functional capabilities as specified by Dr. Rashbaum *1060 in APS No. 6, education (Bachelor of Science in microbiology), training, and work history, and which would meet the earnings requirement in the Policy. AP 938-40, 1926-33. The EAR identified no occupations. AR 940, 1927.
G. Hartford continued to pay benefits
On April 22, 2010, Hartford calculated the product of Plaintiff's indexed pre-disability earnings and her benefit percentage to be $ 3,974.52 per month.[11] AR 937. It was further noted Plaintiff had chronic pain which radiated down the leg which may be due to nerve damage. AR 937. It was noted Plaintiff had been referred to Dr. Bernstein with chronic low back pain and leg pain. Hartford determined as follows:
Based on the history of the clmt's multiple back surgeries, continued treatment for severe back pain and in to her legs (including class II meds and spinal stimulator) it is likely clmt would be unable to participate in any type of work activity on a full time basis. Clmt's level of medication and need to be bed-ridden for multiple days at a time would impact even limited activity and would be unable to sustain full time work.
AR 941.
Hartford determined Dr. Rashbaum's opinion on Plaintiff's functional capacity was supported by the medical records to date and was reasonable, especially considering Plaintiff was still dealing with the pain she claimed was caused by the spinal cord stimulator and had only begun to work with Dr. Bernstein "to reduce pain level and maintain some stability" using class II drugs for pain management. AR 937-38. Finding Plaintiff was incapable of performing the essential duties of any occupation because she could not sit, stand, or walk for longer than fifteen or twenty minutes at a time and for only up to four hours a day, Hartford determined Plaintiff was disabled under the "Any Occupation" definition of disability and she was entitled to benefits on and after April 24, 2010. AR 940, 1029 (Letter dated April 29, 2010).
Hartford continued to periodically review the LTD Claim as Plaintiff worked with Dr. Bernstein, who was "switching the medications to see what works best." AR 935. Between November 2010 and July 2015, Plaintiff routinely updated Hartford regarding the status of her pain management with Dr. Bernstein. When Dr. Bernstein retired in December 2011, Plaintiff updated Hartford with records from Dr. Noor Gajraj.[12] Plaintiff explained the different medication combinations she tried and how she reacted to each medication. She also advised the spinal cord stimulator was removed in December 2012 because it was ineffective. AR 1817-1823 (March 17, 2014 questionnaire) at 1818. Plaintiff reported that medications did little to alleviate her pain. AR 935.
Dr. Bernstein and Dr. Gajraj corroborated Plaintiff's statements in APS dated December 3, 2010 by Dr. Bernstein ("APS No. 7"), APS dated October 31, 2012 by Dr. Gajraj ("APS No. 8"), APS dated *1061 March 19, 2014 by Dr. Gajraj ("APS No. 9"), and APS dated July 10, 2015 by Dr. Gajraj ("APS No. 10"). AR 1905-06 (APS No. 7), AR 1848-49 (APS No. 8), AR 1798-99 (APS No. 9), and AR 1752-53 (APS No. 10). In the most recent APS No. 10, dated July 10, 2015, Dr. Gajraj listed Plaintiff's primary diagnosis as lumbar degenerative disc disease and her secondary diagnosis as lumbar radiculopathy. AR 1752-53. He listed her medications as Dilaudid and Fentanyl and her current subjective symptoms as right sided low back pain and right leg pain and tenderness. AR 1752. He opined Plaintiff could walk, stand, and sit for fifteen to twenty minutes at a time and for no longer than four hours per day. AR 1753. Dr. Gajraj also stated he did not believe Plaintiff was competent to direct the use of her claim proceeds. AR 1753.
On February 20, 2011, Hartford management reviewed Plaintiff's claim and noted:
[Plaintiff] continues with chronic lower back and leg pain. Dr. Bernstein is managing her medications and making adjustment to help better control [her] pain. [She] is also having side effects from the meds and her weight is also of concern.... Although Dr. Bernstein notes that [Plaintiff] has the capacity to lift up to 10 lbs. frequently and up to 20 lbs. occasionally and able to frequently fingering and handling, due to chronic intractable pain she is limited to 15-20 minutes sit/stand/walk for no more than 4 hrs/day. Therefore, it is reasonable that [Plaintiff] would be unable to sustain fulltime any occ[upation] activities.
AR 926.
On June 4, 2011, Hartford determined that, due to her medical history of multiple failed back surgeries and her continued need to take class II medications, "it was likely [Plaintiff] would be unable to participate in any type of work activity on a full time basis." AR 922. It was further noted that Plaintiff's level of medication and need to be "bed-ridden for multiple days at a time would impact even limited activity and would be unable to sustain full time work." AR 922. In her June 8, 2011 call, Plaintiff noted Dr. Bernstein had increased her Fentanyl medication, but she still experienced pain in her right lower back where she has "damaged nerves." AR 920-21. Plaintiff further noted her medications affected her - she was not as coherent as before; her memory was not as good; and she had a hard time remembering things. AR 921.
The following week, Hartford determined it would try to close Plaintiff's claim by offering her a lump sum settlement. AR 922. On June 17, 2011, Hartford offered Plaintiff a lump sum of $ 165,300.00 to settle her claim. AR 926-27. Plaintiff did not respond to the offer. AR 919.
H. Further investigation into Plaintiff's functional capacity
Over the years, Hartford has placed Plaintiff under video surveillance by its Special Investigative Unit ("SIU"). Extensive surveillance was performed in 2008, 2009, and 2011. In February and March 2011, SIU investigated the LTD Claim because of inconsistencies between Plaintiff's self-reported functionality during a January 2011 call and Dr. Bernstein's opinion of Plaintiff's functionality in APS No. 7. AR 1302-06 (2011 SIU Case Report) at 1303-04. Hartford also noted Plaintiff's claims of cognitive impairment seemed at odds with the highly detailed communications she sent to Hartford about her condition. AR 1302.
When Plaintiff was observed outside in April of 2011, she walked in a slow manner and "with her hand rubbing her low back area." AR 1306. On May 10, 2011, it was noted there had been no inconsistencies or *1062 evidence of fraud or misrepresentation. AR 1306. Hartford's SIU closed its file on Plaintiff after determining the evidence it gathered warranted no additional involvement. AR 922.
In July of 2015, Plaintiff reported increased lower back pain for the previous eighteen months. AR 912. On July 17, 2015, Hartford determined it was unreasonable to expect Plaintiff to return to full time gainful employment, noting the findings contained in APS 10 dated July 10, 2015 by Dr. Gajraj. AR 912. It was noted Plaintiff was only forty-eight years old and remained disabled, and the benefit end date was listed as 3/13/2034. AR 912-13. Hartford noted its Risk Management resources had been exhausted and that Plaintiff's claim was again referred to LSS (lump sum settlement). AR 913.
A Hartford manager, however, determined a lump sum settlement offer should be deferred due to Plaintiff's cognitive decline and the possibility she would be getting a divorce. AR 913-14. Specifically, the manager concluded:
Clmt reports significant memory issues d/t class II narcotics she is taking for pain relief. Clmt state[s] she is unable to remember things well, has times when there is a spike in her Fentanyl patch that causes her to feel dizzy, nauseous and 'loopy.' Clmt reports she does not drive at all. Clmt states she has a hard time remembering specific dates, numbers, what happened on certain dates and that her husband is tired of being her caretaker. LSS would not be appropriate based on Clmt's cognitive decline and her reports that she may be getting a divorce.
AR 913-14 (emphasis added).
In April 2016, Hartford reassigned Plaintiff's claim to a Specialty Analyst and changed her Continuing Ability Review ("CAR") level. AR 909. Hartford again referred Plaintiff's claim to its SIU, but noted that if SIU again closed its file without need for further review, the Specialty Analyst would review the claim to determine if additional claim management was needed; if no additional claim management was needed, the Specialty Agent would determine Plaintiff's appropriate CAR level. AR 909.
According to Hartford, SIU again investigated the LTD Claim because of inconsistencies between Plaintiff's self-reported functionality in the July 13, 2015 claimant questionnaire ("questionnaire"), Dr. Gajraj's opinion on Plaintiff's functional capacity in APS 10, and Plaintiff's Internet postings showing actions inconsistent with her claimed limited functionality (i.e. , attending two concerts (one in 2012 and another in 2015) and references to knitting). AR 1307-19 (2016 SIU Case Report); 1752-53 (APS No. 10); AR 1140-42 (Etsy profile); 1143-92 (pages from Plaintiff and Plaintiff's husband's Facebook profile) at 1143, 1145, 1154-55 (Dave Matthews Band concert); 1218-23 (Instagram profile); 1226-27 (Patreon profile).
In the questionnaire, which was also Plaintiff's most recent communication to Hartford at that time, Plaintiff told Hartford that her pain was increasing, not decreasing, and that she could not sit for longer than thirty minutes a day or stand for longer than ten minutes. AR 1785-91 (July 13, 2015 questionnaire) at 1786-87. According to Hartford, in APS No. 10, Dr. Gajraj stated Plaintiff was capable of sitting, standing, and walking for fifteen to twenty minutes at a time and up to four hours a day. AR 1752-53 (APS No. 10).
Hartford sought video surveillance for a third time to obtain updated information about Plaintiff's functionality. Hartford also obtained updated medical records, an in-person interview of Plaintiff, and an independent *1063 medical examination. AR 1307-19 (2016 SIU Case Report) at 1309, 1311-13.
Video surveillance
Surveillance of Plaintiff took place on April 29-30, 2016, May 6, 2016, and June 8-9, 2016. AR1071-80 (Report of April and May 2016 Video Surveillance); 1048-55 (Report of June 2016 Video Surveillance). Plaintiff was not observed during the April and May dates, so surveillance was re-attempted in June. AR 1311.
On June 8, 2016, Plaintiff "was observed breaking down several large cardboard boxes" and "placing them into recycling and trash bins." AR 1048-55 (Report of June 2016 Video Surveillance) at 1052; AR 1311. To do this, Plaintiff "bent at the waist multiple times, used both hands, arms, shoulders, neck, back, and both legs to press down and compress boxes; then lifted them and deposited them into the bin." Id. Plaintiff was also observed moving the bins to different locations. Id. According to Hartford, Plaintiff was observed performing activities she claimed she could not do in the questionnaire dated July 13, 2015, without any noted stress or exertions. AR 904.
In the questionnaire, Plaintiff described her functionality as follows:
I will get up in the morning. I may shower and only do that every other day or every few days in the winter and try to shower every day in the summer if pain is permitting. In the morning; I will watch TV, read magazines or books or check email for a few minutes, or knit or crochet, talk on the telephone to my Mom every few days.... I will do the same type of activities in the afternoon. I do not do anything to hurt myself. I may run the iRobot© vacuum to help clean, but that is all. I may dust with a rag, but not much. My husband does the majority of cleaning tasks. He cooks the meals for us. I am very limited because if I do try to vacuum the floor or mop the floor, it will cause me severe pain and I will pay for it for the rest of the day and maybe for a few days.
AR 1785-91 (July 13, 2015 questionnaire) at 1787.
Hartford sent Dr. Gajraj a copy of the surveillance and asked whether it impacted his opinion on Plaintiff's functionality. AR 903 ("Contact Dr. Gajraj and provide the video summary, the video, interview and statements of disability, and request a response in relation to the claimant's current functional abilities."). Dr. Gajraj never responded. AR 895 (noting response to video surveillance from Plaintiff's treating gastroenterologist but none from Dr. Gajraj after "numerous attempts at follow up").
Updated medical records
In June 2016, Hartford received updated medical records from Dr. Gajraj for six office visits between February 17, 2015 and May 6, 2016. AR 1740-49. In each record, Plaintiff's chief complaint was right-sided low back pain and right leg pain. In each record, Dr. Gajraj wrote that "[Plaintiff] is taking her medication as prescribed without significant side-effects and is gaining benefit in terms of analgesia and increased function." AR 1742-46, 1749. In each record, Dr. Gajraj also wrote that a review of her central nervous system found her to be "alert, oriented, no signs of excessive sedation," "[g]ood remote memory," "[a]dequate attention span and able to concentrate." Id. Each record also noted Plaintiff's chief complaint remained "right-sided low back pain and right leg pain." Id. The assessment in each record was lumbar degenerative disease/radiculopathy. Id.
During this time, Dr. Gajraj obtained one objective medical test, a Sudoscan on May 14, 2015, to detect peripheral neuropathy (damage to the peripheral nerves).
*1064 AR 1747-48 (Sudoscan Report). Plaintiff's Sudoscan found possible early signs of peripheral autonomic neuropathy. AR 1747. Despite Dr. Gajraj's intent to retest Plaintiff on Sudoscan, Plaintiff declined a retest. AR 1742-44.
Hartford also received records from Plaintiff's treating gastroenterologist, David Park, M.D., for office visits in April 2015 and May 2016. AR 1633-59. On May 10, 2016, Plaintiff reported she was still on pain medications for her chronic pain. AR 1633. Plaintiff also reported symptoms of back and joint pain. AR 1634, 1641.
In-person interview
In light of Plaintiff's observed activity during the video surveillance in June 2016, Hartford requested an in-person interview with Plaintiff to further evaluate her condition. AR 1312. On July 1, 2016, Plaintiff was interviewed at her residence from 12:57 p.m. until 2:00 p.m. AR 901; AR 1262-1294 (Transcript of In-Person Interview). During the interview, Plaintiff explained she had pain in her lower back on both sides, and down both legs, prior to her first surgery; although the pain in her left side improved following surgery, the pain in her right side did not improve at all. AR 1264. Plaintiff stated she had more surgeries, including a spinal cord stimulator placed in the spot on her left side where she had scar tissue and damage. According to Plaintiff, that aggravated the scar tissue and made her left side worse again; it was removed in 2012 because it did not help her lower back pain, which was the most "intense part." AR 1364.
The interviewer acknowledged Plaintiff was living with pain "probably 100% of the time," but he wanted to address her functionality. AR 1267. Plaintiff stated she could walk around the grocery store for about thirty or forty minutes. AR 1268. Plaintiff further stated she has more pain in her right leg and foot and had been "starting to fall a lot over... from [her] right foot." AR 1268. At the time of the interview, Plaintiff maintained she was basically homebound. AR 1269 ("I'm here at the house by myself. I don't have a car. I don't drive. If I go out ... if I have to go to the doctor, my husband takes me or my mother will come take me."). She also stated she could sit for an hour on a cushioned seat and fifteen minutes on a hard seat; occasionally grocery shop when her husband was with her; carry up to eleven pounds; and bend forward at the waist to pick up something from the ground. AR 1268, 1272-73, 1280. Plaintiff stated she can do simple, easy straightening up and cleaning inside the house, and she can take out light but not heavy trash. AR 1285-86.
Plaintiff explained she has good days and bad days. The Fentanyl patch, which helps mask a lot of her pain, lasts two days. AR 1283-84. After she changes the patch on the second day, she experiences more pain because "it takes a while for it to get back up to a certain level for [her] to feel like [she] can move a little bit better, you know, to kind of get over that pain." AR 1283. Plaintiff stated the medications make her memory fuzzy, and she has to write things down. AR 1289.
In the summary of the in-person interview, the investigator stated that Plaintiff "walked with a smooth but slow stride, bent over posture and shuffling style gait." AR 1607. Plaintiff did not spontaneously report any pain in walking "but exhibited a noticeable difficulty in walking." AR 1607. When Plaintiff stood, she did so with her weight evenly distributed upon her feet, but her "upper body was bent forward as if she was resting on a walker." AR 1607. Plaintiff "sat forward on the couch leaning on a pillow in her lap the entire interview" and advised the interviewer "she had just changed the Fentanyl patch and the medication had not absorbed and started blocking *1065 the pain." AR 1607. Plaintiff displayed a "bent over posture" when standing, walking, and sitting; "[s]he slumped forward when walking and she leaned forward on a pillow when sitting." AR 1608. Throughout the entire interview, Plaintiff complained of pain in her lower back. She did not display any objective signs of cognitive impairment or lack of focus in the presence of the interviewer. AR 1608.
On July 19, 2016, Hartford's SIU completed its investigation and found no evidence warranting continued investigation. AR 900. Its investigator wrote Plaintiff to advise her she had been under surveillance, but that no more was planned. AR 999. The claim notes contain an entry from the SIU investigator dated a week after she notified Plaintiff that the investigation was closed, stating the pervious note should be disregarded and the SIU investigation was continuing.[13] See, e.g. AR 899.
Independent medical examination
On August 30, 2016, the Specialty Analyst wrote Plaintiff and advised her she was required to attend an independent medical examination ("IME"). AR 995-96. Hartford sought further clarification on Plaintiff's back pain issues by obtaining an IME through independent third-party vendor, Medical Consultants Network. AR 895-96 (noting "an additional opinion is needed to clarify the claimant's current maximum level of functional ability... unable to get an opinion from the pain mgmt. provider.").
After receiving the letter, Plaintiff called the Specialty Analyst and explained that traveling from her home in McKinney, Texas to the IME doctor's office in Arlington, during rush hour traffic, would take at least two hours. She explained she could not physically tolerate this length of car trip and asked if she could attend an IME with another doctor closer to her home. AR 889. The Specialty Analyst stated she would try to confirm whether that IME vendor was closest to Plaintiff's home. Id. Hartford ultimately scheduled the IME with Board Certified Physical Medicine and Rehabilitation physician John Sklar, M.D., in Fort Worth. AR 878-79 (scheduling IME with Dr. Sklar).
Plaintiff and her husband traveled to Fort Worth and stayed in a hotel the night before the exam to ensure she could attend the IME the next day. AR 877. Dr. Sklar performed the examination and prepared a report of his findings and opinion dated October 20, 2016 (the "IME Report"). AR 1528-30 (IME Report). According to Dr. Sklar, a 2009 MRI revealed Plaintiff had a "problem with pain out of proportion to any known structural abnormalities." AR 1529. On physical examination, Dr. Sklar noted Plaintiff walked with a forward flexed posture holding her back, with a "fairly normal" gait. AR 1529. He also noted there were multiple healed scars over the lumbar region and decreased sensation in the bilateral lower extremities especially in the S1 distribution. "Straight leg raising to 90 degrees in the seated position cause[d] complaints of back pain only." AR 1529. There was moderate tenderness to palpation over the lumbosacral junction and bilateral gluteals and left lateral thigh/greater trochanter region. The physical examination was consistent with the diagnosis of chronic unspecified lower back pain, but there was no "clear evidence of any persistent radiculopathy and records [were] not consistent with the diagnosis of chronic radiculopathy either." AR 1529.
*1066 Hartford had asked Dr. Sklar whether, given the totality of the medical evidence and other information provided, he felt there are any restrictions or limitations as to Plaintiff's activity, and if so, would she be capable of performing activity up to forty hours per week with these restrictions. AR 1530. In response, Dr. Sklar opined Plaintiff could work a light or sedentary occupation up to forty hours a week with the following restrictions and limitations based on her chronic pain condition and "[t]o accommodate her pain:" ability to change positions on an as needed basis with up to six hours per day of sitting and the rest of the day spent in a combination of standing and walking for up to two hours; occasionally lifting up to twenty pounds; and no repetitive bending or twisting. AR 1530. Dr. Sklar explained the restrictions and limitations were in line with industry standards. Id.
Dr. Sklar further stated as follows:
This claimant has pain. Pain is clearly not a reason not to work and the evidence based medical literature suggests that persons with chronic pain are actually well served by engaging in normal life activities especially work.
Work then is not only reasonable here it would be a part of the claimant's reasonable treatment plan to treat her pain complaints. I make these recommendations then in the claimant's best interest. It would be predicted that if she continues on an off-work status her situation will continue to deteriorate and returning to work is the one intervention which would actually be expected to stop that deterioration from occurring.
Id.
After reading the report summarizing the June 2016 video surveillance (he could not get the surveillance video to play), Dr. Sklar noted Plaintiff was observed putting things in a trash bin, activities which seemed to be "fairly vigorous" and "demonstrate [Plaintiff] having functional capabilities consistent with those [Dr. Sklar] outlined above at least for a brief period of time ." AR 1530 (emphasis added). After viewing the surveillance, Dr. Sklar confirmed on November 8, 2016 it did not change his opinion regarding Plaintiff's functionality. AR 1525.
Hartford provided the IME Report to Dr. Gajraj and asked if it impacted his opinion on Plaintiff's functionality. AR 872 ("MCM to send copy of IME report to Dr. Gajraj and allow 15 days for a response."); 994 (Letter dated Nov. 9, 2016 transmitting copy of IME Report to Dr. Gajraj and asking for his comments regarding same).Dr. Gajraj did not respond. AR 870 ("Copy of IME report sent to Dr. Gajraj no response").
I. First EAR Addendum
The Specialty Analyst commissioned a new employability analysis report from Hartford's in-house vocational consultant.[14] AR 870. The consultant was specifically instructed to consider the function opined by Dr. Sklar (that Plaintiff could work forty hours per week, sit six hours per day, and stand and walk two hours per day, with no repetitive bending or twisting) and determine if the updated function would "alter the outcome of the [first] EAR completed on 4/22/10." AR 1508. On December 8, 2016, Hartford updated the first EAR using Dr. Sklar's restrictions and limitations in the IME Report (the "First EAR Addendum"). AR 1508-09.
Unlike the first EAR, the First EAR Addendum identified several occupations *1067 Plaintiff was well-suited for based on her education, training, and work history, and which met the earnings requirement in the Policy (i.e. , quality-control coordinator, administrative assistant, director of research and development, consultant, project direction, executive secretary). AR 1511-12. Essentially, the First EAR Addendum found Plaintiff could return to her former occupation, or a similar occupation. AR 1508-09; 1513-19 (as one example, the executive secretary or executive administrative assistant occupation identified is described as providing "high-level administrative support" and also training and supervising lower-level clerical staff).
J. Hartford terminated LTD benefits effective December 15, 2016
On December 15, 2016, Hartford notified Plaintiff that because her physical functionality had improved such that she was capable of performing the essential duties of "Any Occupation," she no longer met the definition of disability under the Policy beyond December 14, 2016. AR 985-92 (Letter dated December 15, 2016). Thus, she was not eligible for and would not receive benefits as of December 15, 2016. AR 985. In its denial letter, Hartford explained its denial, in pertinent part, as follows:
Although the medical information previously submitted was determined to support Disability from Your Occupation and from Any Occupation, the totality of the information on file to include the medical records, the surveillance footage, the information reported during the in-person interview, and the information compiled during the Medical Case Manager review has changed our assessment of your physical functionality.
We have concluded from the combination of all the medical information in your file that you are able to perform full time work within the restrictions and limitations provided by Dr. Sklar.
AR 990.
Hartford pointed to the June 2016 video surveillance that captured Plaintiff breaking down boxes and the in-person interview where she allegedly admitted to being more active and capable of much more activity than she had reported to Hartford in the past. AR. 988-89. Hartford also explained that it considered the most recent medical records from Dr. Gajraj, and specifically referenced the record from a May 6, 2016 office visit that noted "Plaintiff had analgesia" and "increased function" on her medications. AR 988. Hartford summarized the IME Report, specifically Dr. Sklar's findings and opinions that Plaintiff was capable of working in a sedentary or light occupation up to forty hours per week with specified restrictions and limitations. AR 989-90. Hartford noted Dr. Gajraj had yet to respond to Hartford's requests for his comment on the IME Report. AR 990.
Hartford concluded by briefly reciting the occupations identified in the First EAR Addendum that Plaintiff could perform. AR 990-91. Hartford referenced the First EAR Addendum to contend Plaintiff could return to high-level positions paying six-figure salaries, such as Project Director, or Director, Research and Development. AR 990.
K. Plaintiff's appeal
On June 7, 2017, Plaintiff, through counsel, appealed Hartford's decision to terminate Plaintiff's LTD benefits. AR 1388-98 (Letter dated June 7, 2017). According to the letter, Hartford's stated justification for the denial of Plaintiff's benefits (video surveillance, in-person interview, and information compiled during Hartford's Medical Case Manager Review) was disingenuous, noting there was no inconsistency *1068 that justified Hartford's reversal regarding Plaintiff's claim. AR 1388-89. Plaintiff's counsel argued Dr. Sklar failed to consider Plaintiff's complaints of pain and made no mention in his report of the cognitively impairing effects of Plaintiff's required medication. AR 1396. Counsel also referenced the 2009 opinion of medical consultant for the Social Security Administration, Teresa Fox, M.D., that Plaintiff's alleged limitations caused by her symptoms were supported by medical and other evidence of record.[15] AR 1396-97.
Plaintiff's counsel submitted the following documents with the appeal: (1) an entire copy of the Social Security Disability file on a CD (AR 462-760);[16] (2) updated records from treating primary care doctor Purvi Sanghvi, M.D., for October 2016 and December 2016 (AR 1-8); (3) updated records from treating pain management doctor Dr. Gajraj for the period of August 2016 to May 2017 (AR 9-13); (4) letter from Dr. Gajraj dated June 6, 2017 (AR 14); and (5) a medical log prepared by Plaintiff (AR 15-47).
In October 2016, Plaintiff established primary care with Premier Care Internal Medicine in McKinney, Texas. AR 6. According to Dr. Sanghvi, Plaintiff reported that due to severe back pain she had been seeing a pain management specialist for the past four years. It was also noted that Plaintiff reported being forgetful and having to write "everything down due to her being on high dose narcotics." AR 6. The assessment included chronic pain syndrome and Celiac disease. AR 6.
In each record from her pain management physician from August 2016 to May 2017, Dr. Gajraj wrote that Plaintiff was still complaining of low back and right leg pain. AR 10-13. It was further noted that "[Plaintiff] is taking her medication as prescribed without significant side-effects and is gaining benefit in terms of analgesia and increased function." AR 10-13. In each record, Dr. Gajraj also wrote that a review of her central nervous system found her to be "alert, oriented, no signs of excessive sedation," "[g]ood remote memory," "[a]dequate attention span and able to concentrate." Id.
In his June 6, 2017 letter, Dr. Gajraj stated as follows:
I am a Board Certified Pain Management doctor and have been [Plaintiff's] treating physician or more than five years. I am very familiar with her condition.
[Plaintiff] suffers from chronic pain, secondary to lumbar degenerative disc disease /radiculopathy. Although she is capable of performing limited light tasks, I do not believe she is capable of working in a competitive environment. Even limited physical exertions cause her to require significant down time. If she were to attempt to return to even a sedentary work environment, she would require significant time off-task each day. I believe *1069 she could perform no more than 2-4 hours of work per day. She additionally requires the fentanyl patch 100 mcg/hr and Dilaudid simply to achieve limited function. These medications, however can impact cognition and the ability to perform detailed tasks. I consider [Plaintiff] to be disabled from competitive work.
AR 14.
L. Hartford's review of the appeal submission
Hartford documented its review of the appeal submission. AR 859-61 (appeal review) at 861 ("Additional information submitted for consideration on appeal include the following..."); 854-55 ("Receipt of CD Rom submitted by attorney representative contains the following documentation..."). Hartford noted Dr. Sanghvi's medical record for an office visit in October 2016 "noted no abnormalities." AR 854; see also AR 6-7. Dr. Sanghvi's record in December 2016 "noted [Plaintiff] as alert, oriented, cognitive function intact with good eye contact, judgement and insight with good mood/affect," and "[Plaintiff's] muscoskeltal [sic] and neuro evals were [within normal limits] with no abnormalities noted," and noted the visit was a "general adult medical examination without abnormal findings." AR 854; see also AR 2-5.
Hartford also noted the updated medical records from Dr. Gajraj for office visits between 2015 through May 2017 "confirm [Plaintiff] was gaining benefit from her [medication] regimen in terms of analgesia and increased function with no exam abnormalities," and "note [Plaintiff] reports of doing well overall with no complaints of medication side-effects and increased function." AR 855, 861. The most recent record from an office visit with Dr. Gajraj on May 5, 2017 "confirmed [Plaintiff] as alert, oriented with no signs of excessive sedation with good remote memory and adequate attention span and concentration." AR 855.
Hartford found Dr. Gajraj's medical records did not support his opinion in APS No. 10 and letter dated June 6, 2017, in which he opined Plaintiff is only capable of four hours of physical functionality due to debilitating chronic pain associated with lumbar degenerative disc disease and radiculopathy, and that her medication only allowed her to achieve limited function and caused her cognitive impairment. AR 861; see also AR 14 (Letter dated June 6, 2016); 1752-53 (APS No. 10).
M. Hartford's peer review
As part of its consideration of Plaintiff's appeal, Hartford obtained a peer review through an independent third-party vendor, Exam Coordinators Network ("ECN"). AR 853 ("Given the discrepancy in the medical evidence exam findings from the claimant's pcp, pain management and IME physician and the claimant's Pain AP opinion on functionality, it is reasonable to submit the claim file documentation for a Pain Management [sic] independent medical review ...."). Board Certified Physical Medicine and Rehabilitation and Board Certified Pain Medicine physician Dr. Jamie L. Lewis was identified by ECN to review Plaintiff's medical records and objectively analyze her functionality. AR 849, 1341-54 (Peer Review). Dr. Lewis' review did not involve a physical personal evaluation of Plaintiff.
On July 19, 2017, Dr. Lewis provided a summary of his findings and opinions (the "Peer Review Report"). AR 1341-54. Dr. Lewis reviewed some of Plaintiff's medical records dating back to February 2008, physical therapy records, attending physician statements, and Dr. Sklar's IME Report. AR 1342-43. Dr. Lewis also reached out to Dr. Gajraj and Dr. Sanghvi to discuss their recommendations for restrictions *1070 and limitations. Id. at 1348, 1351-53 (noting in Peer Review Report he left "detailed message[s]" for Dr. Gajraj and Dr. Sanghvi and faxed both questions). Dr. Sanghvi responded, and advised that as she had treated Plaintiff for upper respiratory issues, her scope of treatment would not result in restrictions or limitations, and Dr. Gajraj should be consulted for limitations due to pain. AR 1351-52. Dr. Gajraj did not respond. AR 1348 (noting in Peer Review Report that Dr. Lewis received no response from Dr. Gajraj).
Based on his review, Dr. Lewis concluded Plaintiff's surgical history and chronic pain issues warranted functional limitations that would likely be "ongoing and indefinite." AR 1349-50. These limitations proscribed climbing ladders, crawling, walking on uneven ground, or balancing, and they also limited overhead reaching, pushing, pulling, and sitting, standing, or walking. Id. Agreeing with Dr. Skylar's IME Report, Dr. Lewis concluded Plaintiff could work eight hours a day, forty hours a week with certain restrictions and limitations: sitting one hour at a time for up to six hours a day, alternating as needed between standing (thirty minutes at a time up to four hours a day) and walking (thirty minutes at a time up to four hours a day). AR 1349-50. Dr. Lewis observed that Plaintiff's medication regimen of Fentanyl patches and Dilaudid pills provides "functional benefit without evidence of any adverse side effects" and that neurological findings were intact. AR 1348.
The EAR was again updated using Dr. Lewis' opinion on Plaintiff's functionality (the "Second EAR Addendum"). AR 841-42 (noting adjustment for stooping, kneeling, crouching, anc climbing (for stairs only) to occasionally and handling, fingering and feeling to constantly), AR 1323-39. According to Hartford, Dr. Lewis' opinion on functionality did not "alter the outcome of the [First EAR Addendum]." AR 842 ("These updates increased the number of identified occupations from 746 to 852; and will not alter the outcome of the previous EAR in which the following occupations were identified...."); AR 977 ("The Employability Analysis Report (EAR) completed in 12/2016 was based on the IME restrictions and limitations which were not as detailed as those provided by the current pain specialist review and as such an amended EAR was completed on 07/19/2017 without altering the prior outcome or sample identified occupations.").
On July 25, 2017, Hartford advised Plaintiff's counsel that it was upholding its decision to terminate Plaintiff's LTD benefits. AR 973-78 (Letter dated July 25, 2017). In the letter, Hartford identified the information it considered during its appeal review of Plaintiff's LTD Claim. AR 973-74. Hartford explained that the most recent evidence showed Plaintiff was capable of working any occupation. Id. The letter further stated as follows.
Dr. Gajraj's records between February 2015 and May 2017 showed that Plaintiff's medication regimen of Fentanyl patches and Dilaudid pills was adequately managing Plaintiff's back pain with increased benefits in terms of analgesia and increased functional and no significant side effects. AR 974. Hartford stated the restrictions and limitations and accommodations provided by Dr. Lewis, the reviewing pain specialist, appear reasonable and provide full consideration of Plaintiff's medical and surgical history and chronic pain issues and confirm Plaintiff retains functionality. AR 977. Hartford explained the receipt of benefits from Hartford is determined under a different definition of disability than that used by the Social Security Administration and further stated the SSA's disability determination was a piece of relevant evidence but was not conclusive.
*1071 AR 977. Hartford stated the SSA does not conduct an analysis of skills that may be transferrable to other occupations, whereas Hartford does a transferrable skills analysis to determine whether an individual's prior experience and skill set would allow her to perform an occupation with minimal on-the-job training. AR 977-78. Hartford noted the decision was final and that Plaintiff had exhausted her administrative remedies. AR 978.
III. CONCLUSIONS OF LAW
A. Legal Standard
ERISA
"ERISA provides federal courts with jurisdiction to review benefit determinations by fiduciaries or plan administrators." Bellard v. Unum Life Ins. Co. of Am. , No. CV 15-0428, 2016 WL 7108577, at *5 (W.D. La. Dec. 5, 2016) (quoting Estate of Bratton v. National Union Fire Ins. of Pittsburgh, PA , 215 F.3d 516, 520-21 (5th Cir. 2000) (citing 29 U.S.C. § 1132(a)(1)(B) ) ). Under ERISA, a plan participant or beneficiary may sue "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132 (a)(1)(B). The parties do not dispute that Plaintiff, as a participant under a qualifying ERISA plan, is entitled to bring this suit under ERISA.
FED. R. CIV. P. 52
Both parties have elected to proceed pursuant to Federal Rule of Civil Procedure 52, under which the Court conducts "what is essentially a bench trial on the record." Reetz v. Hartford Life and Accident Ins. Co. , 294 F.Supp.3d 1068, 1077 (W.D. Wash. 2018). Rule 52, which governs actions "tried on the facts without a jury," requires the Court "find the facts specifically and state its conclusions of law separately." FED. R. CIV. P. 52(a). In the Fifth Circuit, "Rule 52(a) does not require that the district court set out [its] findings on all factual questions that arise in a case." Koenig v. Aetna Life Ins. Co. , No. 4:13-CV-0359, 2015 WL 6554347, at *3 (S.D. Tex. Oct. 29, 2015), aff'd sub nom. N. Cypress Med. Ctr. Operating Co., Ltd. v. Aetna Life Ins. Co. , 898 F.3d 461 (5th Cir. 2018) (quoting Valley v. Rapides Parish Sch. Bd. , 118 F.3d 1047, 1054 (5th Cir. 1997) (citing Golf City, Inc. v. Wilson Sporting Goods Co., Inc. , 555 F.2d 426, 433 (5th Cir. 1977) ) ). Nor does it demand "punctilious detail [or] slavish tracing of the claims issue by issue and witness by witness." Koenig , 2015 WL 6554347, at *3 (citations omitted). Rather, a court's "[f]indings [are sufficient to] satisfy Rule 52 if they afford the reviewing court a clear understanding of the factual basis for the trial court's decision." Id. (citations omitted).
Using Rule 52 is effective in the ERISA context because courts may resolve factual disputes and issue legal findings without the parties resorting to cross motions for summary judgment. Tran v. Minnesota Life Ins. Co. , No. 17-CV-450, 2018 WL 1156326, at *5 (N.D. Ill. Mar. 5, 2018) ; see also Kearney v. Standard Ins. Co. , 175 F.3d 1084, 1095 (9th Cir. 1999) (noting "the district court may try the case on the record that the administrator had before it."). In a trial on the administrative record, the district judge reviews the evidence to determine "whether [the Plaintiff] is disabled within the terms of the policy." Kearney , 175 F.3d at 1095. Further, "in a trial on the record, but not on summary judgment, the judge can evaluate the persuasiveness of conflicting testimony and decide which is more likely true." Id.
Standard of Review
The standard of judicial review afforded benefits determinations depends *1072 upon whether a claims administrator is vested with discretionary authority. A court reviews a plan administrator's decision de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits;" if the plan does grant such discretionary authority, the court reviews the administrator's decision for abuse of discretion.[17] Firestone Tire & Rubber Co. v. Bruch , 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).
In this case, both parties agree to a de novo standard of review.[18] See Docket Entry # 15 (Plaintiff's Motion to Determine the Appropriate Standard of Review, wherein Plaintiff argued she is entitled to de novo review); see also Docket Entry # 16 (Hartford's stipulation to application of the de novo standard of review for purposes of this lawsuit in response to Plaintiff's motion). Under the de novo standard of review, the court's task "is to determine whether the administrator made a correct decision." Niles v. Am. Airlines, Inc. , 269 Fed. Appx. 827, 832 (10th Cir. 2008) (quoting Hoover v. Provident Life and Accident Ins. Co. , 290 F.3d 801, 808-09 (6th Cir. 2002) ). Hartford's decision to terminate benefits is not afforded deference or a presumption of correctness. Id. at 832 ; see also Salve Regina Coll. v. Russell , 499 U.S. 225, 238, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991) ("When de novo review is compelled, no form of appellate deference is acceptable."). Instead, the court must "independently weigh the facts and opinions in the administrative record to determine whether the claimant has met his burden of showing that he is disabled within the meaning of the policy." Richards v. Hewlett-Packard Corp. , 592 F.3d 232, 239 (1st Cir. 2010).
When a court reviews a plan administrator's decision under the de novo standard, the burden of proof is on plaintiff to prove she is disabled. Oliver v. Aetna Life Ins. Co. , 613 Fed. Appx. 892, 896 (11th Cir. 2015) ("[T]he plaintiff bears the burden to prove that he is disabled."). The burden of proof does not change because a plaintiff qualified at one point in time for disability benefits and the benefits were later terminated when she no longer qualified. See Muniz v. Amec Constr. Mgmt., Inc. , 623 F.3d 1290, 1294-96 (9th Cir. 2010) ("the burden of proof continues to lie with the plaintiff when disability benefits are terminated after an initial grant"). The plaintiff bears the burden of proving by a preponderance of the evidence that she is disabled. Gilewski v. Provident Life & Accident Ins. Co. , 683 Fed. Appx. 399, 406 (6th Cir. 2017) ("[Plaintiff] must prove by a preponderance of the evidence that he was 'disabled,' as that term is defined in the policy."); see also *1073 Dewsnup v. Unum Life Ins. Co. of Am. , No. 2:17-CV-00126-TC, 2018 WL 6478886, at *7 (D. Utah Dec. 10, 2018) (citing Niles , 269 Fed. Appx. at 833 ) ("To prevail, a claimant's entitlement to benefits must be supported by a preponderance of the evidence based on the court's review of the record.").
B. Application to Plaintiff
1. The issue
Before Plaintiff may prevail on a claim of wrongful termination of benefits, she has the burden of demonstrating by a preponderance of the evidence she is disabled within the terms of the Policy. The parties agree Plaintiff was entitled to receive benefits from April 24, 2008 through December 14, 2016. This dispute arises from Hartford's termination of those benefits, effective December 15, 2016.
Given she had already received benefits for 24 months, under the terms of the Policy, Plaintiff is "disabled" if she is "prevented from performing one or more of the Essential Duties" of "Any Occupation." Docket Entry # 17-1 at 25-26. "Essential Duties" means a duty that "1) is substantial, not incidental; 2) is fundamental or inherent to the occupation; and 3) cannot be reasonably omitted or changed." Id. at 26. Plaintiff's ability to work the number of hours in the regularly scheduled workweek is an Essential Duty. Id. "Any Occupation" "means any occupation for which [Plaintiff is] qualified by education, training or experience" and that meets an earnings potential threshold in the Policy. Id. at 25. Disability benefits end when Plaintiff is "no longer Disabled." Id. at 18.
Therefore, to obtain LTD benefits beyond December 14, 2016, Plaintiff must show by a preponderance of the evidence that she cannot perform one or more essential duties of any occupation for which she is qualified.[19] Plaintiff can do this by showing she cannot work the number of hours in a regularly scheduled workweek.
2. De novo review
As the Court is applying de novo review, no deference is given to the claim administrator's decision, and the Court evaluates the persuasiveness of each side's case and determines if Plaintiff has adequately established that she is disabled under the Policy. See Houghton v. Hartford Life & Accident Ins. Co. , No. C16-1186RAJ, 2017 WL 3839577, at *4 (W.D. Wash. Aug. 31, 2017) (citing Oldoerp v. Wells Fargo & Co. Long Term Disability Plan , 12 F.Supp.3d 1237, 1251 (N.D. Cal. 2014) ). Based on the record before it, the Court does not believe Plaintiff could perform the essential duties of any occupation for which she is reasonably qualified. The Court addresses the relevant evidence below.
Plaintiff has suffered from severe back pain since at least 2002, when a diagnostic lumbar discogram revealed severe pathology at her L4-5, L5-S1 intervertebral levels as well as less severe degeneration at her L3-4 level. AR 507-08. Plaintiff underwent surgery in 2002 on her L4-S1 levels and improved for a time, but she began to deteriorate in 2004. AR 521, 533-34. By 2007, Plaintiff could not sit in a chair, lie in a bed, or stand for any significant length of time. AR 521.
*1074 Plaintiff pursued aggressive surgical treatment with neurosurgeon, Robert Martin, M.D. On March 25, 2008, Dr. Martin performed an extreme interbody fusion at L3-4. AR 787-89. In July 2008, Dr. Martin stated Plaintiff could sit for no more than two hours in a day, stand for no more than two hours per day, and walk for no more than two hours per day. AR 1925. Dr. Martin further stated these limitations are permanent. AR 1925.
Still complaining of pain, Plaintiff next sought treatment with Ralph F. Rashbaum, M.D. Dr. Rashbaum diagnosed Plaintiff with "failed back surgery syndrome" and surgically implanted a spinal cord stimulator. AR 2237. The spinal cord stimulator eventually caused an increase in Plaintiff's symptoms, and Dr. Rashbaum surgically removed it in December 2012. AR 1802-03. Dr. Rashbaum recommended Plaintiff start long-term use of class II narcotics. In a "long hard conversation," Dr. Rashbaum advised Plaintiff as follows:
[S]he probably does need to try a class II medication.... I have told her in the past that she will more than likely always be on some form of pain medication, she wanted to avoid class II if possible. I think we have exhausted every other procedure and modality to try to prevent that. I am referring her now to Dr. Bernstein to see if he can find the right medication mix to help reduce her pain so that she can be more active. She wants to do so much, but is very limited physically. I have also provided her with a prescription for handicap parking placard that she can use. I think she pushes herself so far that she has been in such extreme pain that she is bedridden for 2 to 3 days.
AR 2239.
Plaintiff's care then transitioned to pain management physician Sidney Bernstein, M.D., at the Texas Back Institute. Dr. Bernstein stated Plaintiff could sit, stand, and walk for fifteen to twenty minutes at a time and could not do any of the postures for more than a total of four hours per day. AR 1905.
On February 20, 2011, Hartford management reviewed Plaintiff's claim and noted:
[Plaintiff] continues with chronic lower back and leg pain. Dr. Bernstein is managing her medications and making adjustment to help better control [her] pain. [She] is also having side effects from the meds and her weight is also of concern.... Although Dr. Bernstein notes that [Plaintiff] has the capacity to lift up to 10 lbs. frequently and up to 20 lbs. occasionally and able to frequently fingering and handling, due to chronic intractable pain she is limited to 15-20 minutes sit/stand/walk for no more than 4 hrs/day. Therefore, it is reasonable that [Plaintiff] would be unable to sustain fulltime any occ[upation] activities.
AR 926.
When Dr. Bernstein retired in December 2011, Plaintiff updated Hartford with records from her current pain management physician, Noor Gajraj, M.D. Dr. Gajraj is Board Certified in Pain Management and has treated Plaintiff for more than five years. AR 14. In the most recent APS No. 10, dated July 10, 2015, Dr. Gajraj listed Plaintiff's primary diagnosis as lumbar degenerative disc disease and her secondary diagnosis as lumbar radiculopathy. AR 1752-53 (duplicate AR 1783-84). He listed her medications as Dilaudid and Fentanyl and her current subjective symptoms as right-sided low back pain and right leg pain and tenderness. AR 1752. He opined Plaintiff could walk, stand, and sit for fifteen to twenty minutes at a time and for no longer than four hours per day. AR 1753.
*1075 The record indicates Plaintiff's functional impairments persisted beyond December 14, 2016. There are numerous indications from Plaintiff's physicians, and from Hartford's notations, that improvement is not likely with Plaintiff's condition. See , e.g. , AR 1925 (Dr. Martin stating in 2008 the limitations are permanent); AR 955 (note from September 21, 2009 that there was still pain that could be residual damage to the nerves from the hardware hitting the nerve or the original injury and further noting if it was nerve damage it could take 12-18 months to resolve "if at all ") (emphasis added); AR 956 ("Went to Texas Back Institute on 06/01/2009 and revealed she had permanent nerve damage from the screws.") (emphasis added); AR 963-64; 2215-2218 (July 16, 2009 sensory nerve conduction study ) (revealing "reduced recruitment and an increased proportion of high amplitude long duration MUAP's in the bilateral L5 myotomes"); AR 922 (June 2011 notation by Hartford that due to her medical history of multiple failed back surgeries and her continued need to take class II medications, "it was likely [Plaintiff] would be unable to participate in any type of work activity on a full time basis" and also noting Plaintiff's level of medication and need to be "bed-ridden for multiple days at a time would impact even limited activity and would be unable to sustain full time work"). In May 2016, Plaintiff reported current symptoms of back and joint pain to her treating gastroenterologist, Dr. Park. AR 1634, 1641.
Hartford previously determined Plaintiff could not perform the essential duties of any occupation after the definition of "disabled" changed on April 29, 2010. Hartford correctly asserts an administrator's past payment of benefits does not "operate forever as an estoppel so that an insurer can never change its mind," but it fails to acknowledge that past payment of benefits can be a consideration in the Court's de novo review. Muniz v. Amec Const. Mgmt., Inc. , 623 F.3d 1290, 1297 (9th Cir. 2010) (quoting McOsker v. Paul Revere Life Insurance Co. , 279 F.3d 586, 589 (8th Cir. 2002) ). In McOsker , the Eighth Circuit stated that paying benefits does not operate "forever as an estoppel so that an insurer can never change its mind; but unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments ." 279 F.3d at 589 (emphasis added).
In Saffon v. Wells Fargo & Co. Long Term Disability Plan , the Ninth Circuit stated that "MetLife had been paying Saffon long-term disability benefits for a year, which suggests that she was already disabled." 522 F.3d 863, 871 (9th Cir. 2008). The court opined that to find the plaintiff no longer disabled, "one would expect the MRIs to show an improvement , not a lack of degeneration." Id. (emphasis in original). "This requirement imposes no burden on the insurer, but is instead a logical inference that the court may make based on a specific set of facts." Reetz , 294 F.Supp.3d at 1079 (citing Schramm v. CNA Fin. Corp. Insured Grp. Ben. Program , 718 F.Supp.2d 1151, 1162 (N.D. Cal. 2010) ).[20]
*1076 Here, Hartford paid LTD benefits under the more restrictive definition of "disabled" for over six years, until December 14, 2016; thus, the Court would expect to see evidence of improvement in the record. As an initial matter, the Court notes Hartford's notations indicate Plaintiff's use of class II medications played into Hartford's decision. For example, on June 4, 2011, Hartford determined that, due to her medical history of multiple failed back surgeries and her continued need to take class II medications, "it was likely [Plaintiff] would be unable to participate in any type of work activity on a full time basis." AR 922. It was further noted that Plaintiff's level of medication and need to be "bed-ridden for multiple days at a time would impact even limited activity and would be unable to sustain full time work." AR 922.
On July 17, 2015, Hartford determined it was unreasonable to expect Plaintiff to return to full time gainful employment, noting the findings contained in APS 10 dated July 10, 2015 by Dr. Gajraj. AR 912. It was noted Plaintiff was only forty-eight years old and remained disabled, and the benefit end date was listed as 3/13/2034. AR 912-13. Hartford noted its Risk Management resources had been exhausted and that Plaintiff's claim was again referred to LSS (lump sum settlement). AR 913. A Hartford manager, however, determined a lump sum settlement offer would not be appropriate. AR 913-14. Specifically, the manager concluded:
Clmt reports significant memory issues d/t class II narcotics she is taking for pain relief. Clmt state[s] she is unable to remember things well, has times when there is a spike in her Fentanyl patch that causes her to feel dizzy, nauseous and 'loopy.' Clmt reports she does not drive at all. Clmt states she has a hard time remembering specific dates, numbers, what happened on certain dates and that her husband is tired of being her caretaker. LSS would not be appropriate based on Clmt's cognitive decline and her reports that she may be getting a divorce.
AR 913-14 (emphasis added).
Yet, there is nothing in the record indicating Plaintiff's use of class II medications - or the ways in which Plaintiff reported the medications affected her - decreased in any significant way between 2015 and the date Hartford terminated Plaintiff's LTD benefits in late 2016. Nevertheless, Hartford maintains Plaintiff saw improvement in her functionality by July 2016.[21]
*1077 In defending its decision, Hartford states Plaintiff's most recent medical records show she had regained functionality; her functionality was steadily increasing; and she was not experiencing any debilitating side effects from her medications, including any cognitive impairment. Hartford relies primarily on the more recent records from Plaintiff's pain management physician from February 2015 to May 2017. In each record, Dr. Gajraj noted "[Plaintiff] is taking her medication as prescribed without significant side-effects and is gaining benefit in terms of analgesia and increased function." AR 9-13, AR 1740-49. In each record, Dr. Gajraj also wrote that a review of her central nervous system found her to be "alert, oriented, no signs of excessive sedation," "[g]ood remote memory," "[a]dequate attention span and able to concentrate." Id. According to Hartford, the records showed Plaintiff's medication regimen of Fentanyl patches and Dilaudid pills was working. AR 866 (analysis of Dr. Gajraj's medical records).
The Court does not find Dr. Gajraj's comments that Plaintiff was "gaining benefit in terms of analgesia and increased function" under her medication regime as compelling as Hartford does. Despite the medications she was taking, Plaintiff was still experiencing pain. In each record, Dr. Gajraj noted that Plaintiff's chief complaint was right low back pain and right leg pain. AR 9-13, AR 1740-49. Importantly, in his June 6, 2017 letter, Dr. Gajraj described Plaintiff's current condition as follows:
Gina Pike suffers from chronic pain, secondary to lumbar degenerative disc disease /radiculopathy. Although she is capable of performing limited light tasks, I do not believe she is capable of working in a competitive environment. Even limited physical exertions cause her to require significant down time. If she were to attempt to return to even a sedentary work environment, she would require significant time off-task each day. I believe she could perform no more than 2-4 hours of work per day. She additionally requires the fentanyl patch 100 mcg/hr and Dilaudidsimply to achieve limited function . These medications, however can impact cognition and the ability to perform detailed tasks. I consider Ms. Pike to be disabled from competitive work.
AR 14 (emphasis added).
Hartford states Dr. Gajraj's letter does not state the Fentanyl and Dilaudid medications actually impacted Plaintiff, only that they could impact cognition and the ability to perform detailed tasks. However, Dr. Gajraj makes it clear he considers Plaintiff to be disabled from competitive *1078 work, noting she could not perform more than two to four hours of work per day and would require significant time off-task each day. What is more, in APS No. 9 (dated March 19, 2014) and APS No. 10 (dated July 10, 2015), Dr. Gajraj stated he did not believe Plaintiff was competent to direct the use of her claim proceeds.[22] AR 1753.
Hartford further asserts Plaintiff's recent medical records do not support Dr. Gajraj's opinions in the June 2017 letter or in APS Nos. 8-10. However, Dr. Gajraj performed a Sudoscan procedure on May 14, 2015 to detect peripheral neuropathy (damage to the peripheral nerves). AR 1747-48 (Sudoscan Report). Plaintiff's Sudoscan found possible early signs of peripheral neuropathy. AR 1747. Additionally, records from Plaintiff's treating primary care doctor, Purvi Sanghvi, M.D., from October and December 2016 reveal Plaintiff's chronic pain condition remained unchanged.
At the October 2016 visit to establish care with Dr. Sanghvi, Plaintiff stated she was forgetful and had to write everything down due to her being on high dose narcotics. AR 6. Although the examination noted no abnormalities, Plaintiff admitted low back pain. AR 7. Dr. Sanghvi listed Plaintiff's assessments as Celiac disease and chronic pain syndrome. AR 6. Notably, in Dr. Sanghvi's notes from the December 6, 2016 visit (which was approximately one week before Hartford's denial of LTD benefits), Dr. Sanghvi noted on examination Plaintiff's back was "tender to palpation over lumbar-sacral spine." AR 2.
There is other credible evidence regarding Plaintiff's condition, her pain, and the side effects of her medications. Plaintiff routinely updated Hartford regarding the status of her pain management. For example, in her June 8, 2011 call, Plaintiff noted Dr. Bernstein had increased her Fentanyl medication, but she was still experiencing pain in her right lower back where she has "damaged nerves." AR 920-21. Plaintiff further noted her medications affected her - she was not as coherent as before; her memory was not as good; and she had a hard time remembering things. AR 921.
More recently, in a Claimant Questionnaire completed by Plaintiff in July 2015, Plaintiff explained her back pain continued to increase after the 2012 surgery to remove the spinal cord stimulator, noting implanting the stimulator had "aggravated the scar tissue and damaged nerves in [her] lower left back area" so that she had pain on both sides of her back "every day." AR 1786. She stated her pain doctor was prescribing her hydromorphone for the "breakthrough pain," in addition to the Fentanyl patches she was changing every other day; yet, she was still in "severe pain and [ ] hunched over in pain." AR 1786. According to the questionnaire, Dr. Rashbaum had informed Plaintiff she had "significant scarring and nerve damage from when [her] spinal cord collapsed and that it would never get better," and that Dr. Gajraj similarly stated her "situation [was] severe and would never improve." AR 1786. Plaintiff also reported in detail how the pain medications significantly affect her memory and her ability to remember things. AR 1787. In sum, the Court does not agree with Hartford's assertion that the recent medical records show Plaintiff had regained functionality and that she was no longer experiencing significant side effects from her medications.
In further support of its decision, Hartford relies on Plaintiff's self-reported functionality *1079 in the July 2016 in-person interview, the observed functionality in the June 2016 video surveillance, Dr. Sklar's IME Report, the First EAR Addendum, and Dr. Lewis' Peer Review Report. According to Hartford, these show Plaintiff's back pain was being sufficiently managed by the medication regimen of Fentanyl and Dilaudid, such that Plaintiff was not prevented from working forty hours a week in an occupation for which she was qualified and that met the earnings qualifier in the Policy. The Court finds these other indications of improvement relied upon by Hartford similarly unpersuasive, as explained in further detail below.
In-person interview
Plaintiff was interviewed by Jim Jolly with Hartford on July 1, 2016. AR 1263-1294. During the interview, Plaintiff stated she can walk around the grocery store for about thirty or forty minutes. AR 1268. She also stated she could sit for one hour on a cushioned seat and fifteen minutes on a hard seat; she could occasionally grocery shop when her husband was with her; she could carry up to eleven pounds; and she could bend forward at the waist to pick up something from the ground. AR 1268, 1272-73, 1280.
In his summary report of the interview, Mr. Jolly stated Plaintiff "walked with a smooth but slow stride, bent over posture and shuffling style gait." AR 1607. Although Plaintiff did not spontaneously report any pain in walking, she "exhibited a noticeable difficulty in walking." AR 1607. When Plaintiff stood, she did so with her weight evenly distributed upon her feet, but her "upper body was bent forward as if she was resting on a walker." AR 1607. Throughout the entire interview, Plaintiff complained of pain in her lower back. She did not display any objective signs of cognitive impairment or lack of focus in Mr. Jolly's presence. AR 1608. However, Plaintiff told Mr. Jolly during the interview that her medications make her memory fuzzy, and she has to write things down. AR 1289.
Video surveillance
Hartford also relies on the June 8, 2016 surveillance wherein Plaintiff was observed making "two attempts to get one box down small enough" to fit into a trash bin. AR 1615. However, Hartford does not explain the contrast between this one incident and Plaintiff's numerous days of relative inactivity, "a noticeable gap in light of her reports that she could obtain temporary relief from pain medications."[23] See Gross v. Sun Life Assurance Co. of Canada , 880 F.3d 1, 12 (1st Cir. 2018). As described above, the most recent surveillance took place over five days (April 29-30, May 6, and June 8-9), and the investigator saw no activity by Plaintiff on four of those days. She did not leave her house. On June 8, 2016, Plaintiff briefly emerged from her house on two occasions and was seen bending forward and breaking down an empty cardboard box, lifting a hinged lid on her trash can, and moving the can. Hartford treats this only surveilled activity "as decisive over [Plaintiff's] long history of credible pain, without confronting her inactivity during most of the surveillance." Id.
Importantly, there is no necessary inconsistency between the limitations Dr. Gajraj identified in APS No. 10 and the surveilled activity. In his June 2017 letter, Dr. Gajraj noted Plaintiff is capable of *1080 performing limited light tasks; even so, she is not capable of working in a competitive environment, even in a sedentary work environment. AR 14. According to Plaintiff, the limitations, level of activity, and functional ability described in her in-person interview closely matched the level of activity-and inactivity-seen on the video surveillance taken June 8, 2016 and over the course of her claim. The Court agrees.
The Court does not find breaking down a cardboard box and lifting a trash can lid/moving the trash can inconsistent with Plaintiff's own reports as to her limitations in the July 2015 questionnaire and in her in-person interview. Plaintiff told Hartford's investigator that she could touch her toes and "probably touch the ground." AR 1390-91, 1120, 1272-73. She also stated she can push and pull and can handle light garbage. AR 1391, 1274, 1286. Plaintiff stated in her June 7, 2017 Administrative Appeal letter that the video surveillance footage confirmed that she walked with a "shuffling gait and forward-hunched posture." AR 1390. This posture was also repeatedly confirmed by Mr. Jolly in his summary report of the in-person interview. Mr. Jolly specifically noted Plaintiff displayed a "bent over posture" when standing, walking, and sitting; "[s]he slumped forward when walking and she leaned forward on a pillow when sitting." AR 1608.
The opinions of independent reviewing physicians
Hartford bases its termination decision on the opinions of independent reviewing physicians, Dr. Sklar and Dr. Lewis. Dr. Sklar examined Plaintiff in October 2016 prior to Hartford's initial decision to terminate benefits. AR 1528-30. As part of its consideration of Plaintiff's appeal, Hartford obtained a Peer Review Report in July 2017 from Dr. Lewis. The Court addresses each in turn.
Hartford asked Dr. Sklar whether, given the totality of the medical evidence and other information provided, he felt there are any restrictions or limitations as to Plaintiff's activity, and if so, would she be capable of performing activity up to forty hours per week with these restrictions. AR 1530. In response, Dr. Sklar opined Plaintiff could work a light or sedentary occupation up to forty hours a week with the following restrictions and limitations based on her chronic pain condition and "[t]o accommodate her pain:" ability to change positions on an as needed basis with up to six hours per day of sitting and the rest of the day spent in a combination of standing and walking for up to two hours; occasionally lifting up to twenty pounds; and no repetitive bending or twisting. AR 1530. According to Plaintiff, Dr. Sklar took Plaintiff's medical history, conducted his physical examination, and reached his conclusions in only twenty-one minutes. Docket Entry # 17 at 10-11 (citing AR 1528). Plaintiff asserts Dr. Sklar erroneously stated pain cannot be a disabling condition (stating "[p]ain is clearly not a reason not to work ...") and merely suggested that some type of unidentified work could be therapeutic without indicating what type of work would be therapeutic for Plaintiff ("Work then is not only reasonable here it would be a part of the claimant's reasonable treatment plan to treat her pain complaints."). AR 1530. Nevertheless, according to Plaintiff, Dr. Sklar did not opine Plaintiff could return to high-level work, such as the type required under the terms of the Hartford policy and suggested by Hartford in its denial letter.[24]
*1081 The records reveals that since 2002, Plaintiff has consistently reported that she experienced pain. Rather than showing improvement of Plaintiff's condition, Dr. Skylar's IME Report supports Plaintiff's position. On physical examination, Dr. Sklar noted Plaintiff walked with a forward flexed posture holding her back, and she had decreased sensation in the bilateral lower extremities especially in the S1 distribution. He also noted "[s]traight leg raising to 90 degrees in the seated position cause[d] complaints of back pain." AR 1529. There was also moderate tenderness to palpation over the lumbosacral junction and bilateral gluteals and left lateral thigh/greater trochanter region. Dr. Sklar stated the physical examination was consistent with the diagnosis of chronic unspecified lower back pain. However, according to Dr. Skylar, there was no "clear evidence of any persistent radiculopathy and records [were] not consistent with the diagnosis of chronic radiculopathy either." AR 1529. Dr. Skylar acknowledged Plaintiff has pain but did not believe pain could or should preclude a claimant from working.
However, pain can either prevent or make difficult the tasks required by an occupation. See Audino v. Raytheon Co. Short Term Disability Plan , 129 Fed. Appx. 882, 885 (5th Cir. 2005) ("We are also troubled by MetLife's failure to accord weight to Audino's consistent complaints of pain, even though those complaints were documented in her medical records for years before she sought benefits and there is no indication that she overstated her pain once she decided to seek benefits."); see also Schexnayder v. CF Indus. Long Term Disability Plan for its Employees , 553 F.Supp.2d 658, 666-67 (M.D. La. 2008), aff'd in part, rev'd in part sub nom. Schexnayder v. Hartford Life & Acc. Ins. Co. , 600 F.3d 465 (5th Cir. 2010) ("Although pain cannot always be objectively quantified, Mr. Shexnayder's pain is corroborated by medical evidence finding degenerative disc disease and spinal stenosis and notations of pain in the results of the FCE. The Defendant abused its discretion in discounting the subjective evidence of Plaintiff's pain and the objective evidence corroborating the disability.").
In his Peer Review Report, Dr. Lewis agrees with Dr. Skylar's independent medical evaluation and finds Plaintiff would have the capacity to perform gainful employment on a full time basis with certain "ongoing and indefinite" restrictions. AR 1349-50. According to Dr. Lewis, although Plaintiff has continued pain complaints, "there are no objective findings that would prevent her ability for sustainable work 40 hours per week." AR 1350.
The Court finds Dr. Lewis' post-decision report minimally persuasive as well. First, Dr. Lewis did not examine Plaintiff in person. Although there is no treating physician preference in the ERISA context, see Black & Decker Disability Plan v. Nord , 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003), "this does not mean that a district court, engaging in a de novo review, cannot evaluate and give appropriate weight to a treating physician's conclusions, if it finds these opinions reliable and probative."[25] Reetz , 294 F.Supp.3d at 1083 (quoting *1082 Paese v. Hartford Life & Accident Ins. Co. , 449 F.3d 435, 442 (2d Cir. 2006) ). Here, the treating physicians' relationships with Plaintiff allowed them to personally observe the effects of Plaintiff's diagnoses and assess the credibility of her reports of pain. Dr. Gajraj, Plaintiff's pain management treating physician for over five years, stated in 2017 that Plaintiff suffers from chronic pain, secondary to lumbar degenerative disc disease /radiculopathy and is disabled. AR 14. In contrast, Dr. Lewis, because he did not personally examine Plaintiff, could not have observed the effect of Plaintiff's chronic pain or assessed her credibility. As in Reetz , the Court finds the treating physicians' medical opinions to be more reliable and probative of Plaintiff's condition than Dr. Lewis' report. 294 F.Supp.3d at 1083 (citing Oldoerp , 12 F.Supp.3d at 1250 ("[W]hen an in-person medical examination credibly contradicts a paper-only review conducted by a professional who has never examined the claimant, the in-person review may render more credible conclusions.") ).
Additionally, the Court finds certain aspects of Dr. Lewis' report troubling. The record establishes Plaintiff underwent lumbar fusion surgery at L4-5 and L5-S1 in December 2002. AR 532-33. After surgery, Plaintiff experienced a brief time when her pain improved, but she began to deteriorate in 2004. AR 521. Dr. Martin performed surgery on L3-4 on March 25, 2008. In March 2009, Plaintiff had surgery to remove the L4-S1 hardware which had been inserted in the 2002 surgery. AR 644.
However, Dr. Lewis' report presents the timeline as follows:
This claimant is a 50-year old female with lower back pain. She has a history of posterior lumbar interbody fusion at L4-L5 and L5-S1 on 12/04/12 . She previously underwent a extreme lateral interbody fusion L3-4 ... on 03/25/08. She underwent surgery on 03/25/09 to explore the fusion and remove existing spinal hardware. She also underwent a spinal cord stimulator implant in December 2009. She continues to utilize this device for pain control with slight improvement in her symptoms.
AR 1343 (emphasis added). Later in the same report, Dr. Lewis again states Plaintiff's L4-L5 and L5-S1 surgery was performed in 2012, rather than 2002. AR 1348. In both instances, Dr. Lewis states Plaintiff "previously" underwent surgery on L3-4 on March 25, 2008. This belies Hartford's argument that Dr. Lewis' report had a "typographical error on [the] surgery date being 2012." Docket Entry # 26 at 27. Although Hartford argues the error does not change the conclusions in the report, the Court is not so sure. According to Plaintiff, it is important that Plaintiff's L4-S1 surgery predates her L3-4 surgery because "that suggests that she is suffering from Transitional Syndrome, where the prior fusion causes increased stress on adjacent levels" and also implies "possible further deterioration in the future." Docket Entry # 17 at 27.
There are other errors as well. Dr. Lewis states Plaintiff continued to utilize the spinal cord stimulator. AR 1343. However, the record reveals the stimulator was surgically removed in 2012 because it caused an increase in Plaintiff's symptoms. Dr. Lewis also states "[t]hroughout the documentation the claimant reports that she has functional benefit without adverse medication side effects." AR 1349. For these reasons, the Court gives little weight to Dr. Lewis' opinion.
The EAR Addendums
Hartford's first EAR determined there were no jobs Plaintiff could perform that would pay a gainful wage under the Policy criteria. AR 1926-27. On December 8, 2016, Hartford updated the first EAR using Dr. *1083 Sklar's restrictions and limitations in the IME Report. AR 1508-09. Unlike the first EAR, the First EAR Addendum identified several occupations Plaintiff was well-suited for based on her education, training, and work history, and which met the earnings requirement in the Policy. AR 1508-09. Plaintiff asserts the First EAR Addendum, which was the only new EAR available to Hartford at the time of its initial denial, disregarded the functional limitations by Plaintiff's treating doctors, the impact of her chronic pain, and the documented cognitive decline caused by her narcotic medications. Docket Entry # 17 at 11. According to Plaintiff, Hartford did not consider the impact of Plaintiff's required daily use of cognitively impairing medication such a Fentanyl and Dilaudid on her ability to work at this level. Nor did Hartford consider that under Social Security standards for disability, Plaintiff is deemed to be unable to engage in Substantial Gainful Activity, which is work that would pay at least $ 1,170.00 per month.[26]
As noted above, in determining whether Plaintiff is capable of performing the essential duties of any occupation, the Court accords significant weight to the evaluation of Plaintiff by her treating physicians, who have repeatedly concluded Plaintiff can sit, stand, and walk for no more than four hours a day. These evaluations, along with the evidence regarding Plaintiff's chronic pain and the effects of her pain medication, persuade the Court Plaintiff could not continuously engage in any occupation for which she would be qualified.
The First EAR Addendum relied upon Dr. Sklar's IME Report.[27] The Court accords minimal weight to this report. As discussed above, Dr. Skylar's conclusions contradicted those of Plaintiff's treating physicians and thus the First EAR Addendum may not have accurately returned jobs that could be performed by Plaintiff. "In short, the [C]ourt finds that the search did not accurately reflect [Plaintiff's] limitations, and thus, the [C]ourt is not convinced that the jobs returned by the search are ones that [Plaintiff] can perform."[28] Reetz , 294 F.Supp.3d at 1085.
Although not binding, the Court finds the SSA determination is also relevant. See Gellerman v. Jefferson Pilot Fin. Ins. Co. , 376 F.Supp.2d 724, 735 (S.D. Tex. 2005) (noting that "no court has held that an SSA determination is completely irrelevant"). Hartford advocated Plaintiff's cause before the SSA. According to Plaintiff, "[i]t is ironic that this determination, which was sought by Hartford, supported by a vendor hired by Hartford, and resulted in financial gain to Hartford of over $ 194,000.00 was disregarded in order to *1084 justify denying further benefits." AR 1397.[29] The SSA's determination that Plaintiff remains Totally Disabled under its standards, as of April 10, 2017, is further evidence that Plaintiff is both unable to perform the essential duties of any occupation and that she is unable to earn the threshold salary under the Hartford Policy terms.
The Court, having considered all of the evidence relied upon by Hartford in justifying its termination of benefits, finds no evidence of improvement in Plaintiff's condition since Hartford previously found she was unable to sustain full time work in any occupation. Based on the Agreed Administrative Record, Plaintiff has demonstrated by a preponderance of the evidence that she cannot perform the essential duties, which includes the ability to work a full work week, of any occupation for which she qualifies. Plaintiff has shown by a preponderance of the evidence that her disability persisted beyond December 14, 2016. Accordingly, it was improper for Hartford to cease Plaintiff's LTD benefits, and Plaintiff is entitled to the reinstatement of her LTD benefits beginning December 15, 2016.
C. Other equitable remedies
Prejudgment interest
Plaintiff has also requested that pre-judgment interest be awarded. While pre-judgment interest is available in ERISA cases, ERISA does not explicitly provide for prejudgment interest, and whether to grant such a remedy is thus within the discretion of the district court. Cottrill v. Sparrow, Johnson & Ursillo, Inc. , 100 F.3d 220, 223 (1st Cir. 1996), abrogated on other grounds by Hardt v. Reliance Standard Life Ins. Co. , 560 U.S. 242, 130 S.Ct. 2149, 176 L.Ed.2d 998 (2010) ; see also Perez v. Bruister , 823 F.3d 250, 274 (5th Cir. 2016) (citing Hansen v. Cont'l Ins. Co. , 940 F.2d 971, 984 n.11 (5th Cir. 1991), abrogated on other grounds by CIGNA Corp. v. Amara , 563 U.S. 421, 131 S.Ct. 1866, 179 L.Ed.2d 843 (2011) ). "It is not awarded as a penalty, but as compensation for the use of funds." Whitfield v. Lindemann , 853 F.2d 1298, 1306 (5th Cir. 1988).
The Court finds Plaintiff is entitled to receive LTD benefits from December 15, 2016, and to recover pre-judgment interest on those unpaid benefits.
Costs and attorney's fees
The Federal Rules of Civil Procedure state that "[u]nless a federal statute, these rules, or a court order provides otherwise, costs-other than attorney's fees-should be allowed to the prevailing party." FED. R. CIV. P. 54(d)(1). ERISA provides that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). "The Fifth Circuit has held that an award of costs in an ERISA case is limited to those listed in 28 U.S.C. § 1920." Keith v. Metro. Life Ins. Co. , No. CV H-15-1030, 2017 WL 2537296, at *10 (S.D. Tex. June 9, 2017) (citing Humphrey v. United Way of Texas Gulf Coast , 802 F.Supp.2d 847, 868 (S.D. Tex. 2011) (citing Cook Children's Medical Center v. New England PPO Plan of General Consolidated Management, Inc. , 491 F.3d 266, 275-76 (5th Cir. 2007), cert. denied , 552 U.S. 1180, 128 S.Ct. 1223, 170 L.Ed.2d 60 (2008) ) ).
The Supreme Court has held that "a court 'in its discretion' may award fees and costs 'to either party,' as long as the fee *1085 claimant has achieved 'some degree of success on the merits.' " Hardt v. Reliance Standard Life Insurance Co. , 560 U.S. 242, 130 S.Ct. 2149, 2152, 176 L.Ed.2d 998 (2010) (citation omitted). The Fifth Circuit established a five-factor test for deciding whether to award attorneys' fees under § 1132(g)(1) in Iron Workers Local No. 272 v. Bowen , 624 F.2d 1255, 1266 (5th Cir. 1980). Since the Supreme Court's decision in Hardt , the Fifth Circuit has held the Bowen test is no longer mandatory. See, e.g. , LifeCare Management Services LLC v. Insurance Management Administrators Inc. , 703 F.3d 835, 846-47 (5th Cir. 2013) ; Lincoln Financial Co. v. Metropolitan Life Insurance Co. , 428 Fed. Appx. 394, 396 (5th Cir. 2011) (per curiam) (unpublished). However, the Court finds those factors helpful:
In deciding whether to award attorneys' fees to a party under section 502(g), therefore, a court should consider such factors as the following: (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions.
Keith , 2017 WL 2537296, at *10-11 (quoting Bowen , 624 F.2d at 1266 (5th Cir. 1980) (citations omitted) ).
The Court first considers the degree of the opposing party's bad faith. Although the Court did not need to address in its de novo review above whether Hartford's decision to terminate Plaintiff's LTD benefits was influenced by its inherent conflict of interest, the Court considers the conflict of interest here. A finding of bad faith requires more than simply establishing there was a conflict of interest. See Carolina Care Plan Inc. v. McKenzie , 467 F.3d 383, 390 (4th Cir. 2006) (holding that although the record showed that the plan administrator's decision furthered its financial interest, the first factor in the Bowen analysis did not weigh against the plan administrator absent evidence of bad faith), abrogated on other grounds by Glenn , 128 S.Ct. at 2343. Instead, a plaintiff must prove that the conflict of interest actually and improperly motivated the decision. This higher standard separates those cases in which a conflict of interest tips the scale in favor of reversing the plan administrator's benefits determination from those cases in which the plan administrator's bad faith clearly motivated the decision.
Although an abuse of discretion case, the Court finds Hines v. Unum Life Ins. Co. of America , 2018 WL 6599404 (N.D. Ohio Dec. 17, 2018) instructive. Here, similar to Hines , the "record does not offer a smoking gun revealing [Hartford's] bad faith, but several factors add up to reveal [Hartford's] duty to pay fees." Id. at *6. After paying Plaintiff's LTD benefits for so many years, the Court finds noteworthy the timing of Hartford's decision to terminate, as reflected in Hartford's own documentation. On July 17, 2015, Hartford determined it was unreasonable to expect Plaintiff to return to full time gainful employment, noting the findings contained in APS 10 dated July 10, 2015 by Dr. Gajraj. AR 912. It was noted Plaintiff was only forty-eight years old and remained disabled, and the benefit end date was listed as 3/13/2034. AR 912-13. Hartford noted its Risk Management resources had been exhausted and that Plaintiff's claim was again referred to LSS (lump sum settlement). AR 913.
*1086 A Hartford manager, however, determined a second lump sum settlement offer (Plaintiff did not accept the first one offered) would not be appropriate based on Plaintiff's cognitive decline. AR 913-14. However, in April 2016, Hartford reassigned Plaintiff's claim to a Specialty Analyst and changed her Continuing Ability Review ("CAR") level. AR 909. Hartford again referred Plaintiff's claim to its SIU, but noted that if SIU again closed its file without need for further review, the Specialty Analyst would review the claim to determine if additional claim management was needed; if no additional claim management was needed, the Specialty Agent would determine Plaintiff's appropriate CAR level. AR 909. After this reassignment, Hartford proceeded with its "preferred course of action." See Hines , 2018 WL 6599404, at *6.
As a large insurance company, Hartford has the ability to satisfy the award ( Bowen factor two), and such an award may deter Hartford and other insurance companies from similar conduct going forward ( Bowen factor three). The litigated issues are common in ERISA benefit denial cases. See Hines , 2018 WL 6599404, at *7. Finally, the relative merits of the parties' positions are not particularly close, especially considering Hartford's inherent conflict of interest as the payor and benefits eligibility decider ( Bowen factor five). Id. at *6. Overall, these circumstances support an award to Plaintiff for attorney's fees and costs, in addition to the benefits amount owed to her under the Policy.[30] Weighing all the factors, the Court finds they justify an attorney's fees and costs award for Plaintiff.
IV. CONCLUSION
Based on the foregoing, it is
RECOMMENDED that Plaintiff's Motion for Judgment on the Record (Docket Entry # 17) be GRANTED . It is further
RECOMMENDED that Defendant Hartford Life and Accident Insurance Company's Cross-Motion for Judgment on the Record (Docket Entry # 25) be DENIED . It is further
RECOMMENDED that Plaintiff be directed to file, within twenty days from the date of any Order adopting this Report and Recommendation, a motion for pre-judgment interest, costs and attorney's fees. The motion should address the appropriate rate to be prescribed for the pre-judgment interest. The motion should also be supported by evidence reflecting the reasonable amount of costs and fees sought, and shall include argument as to the authority upon which such fees may be granted. Hartford shall file a response, if any, in accordance with the Local Rules, and Plaintiff may file a reply in accordance with the same.
SIGNED this 31st day of January, 2019.

"ERISA provides federal courts with jurisdiction to review benefit determinations by fiduciaries or plan administrators." Bellard v. Unum Life Ins. Co. of Am. , No. CV 15-0428, 2016 WL 7108577, at *5 (W.D. La. Dec. 5, 2016) (quoting Estate of Bratton v. National Union Fire Ins. of Pittsburgh, PA , 215 F.3d 516, 520-21 (5th Cir. 2000) (citing 29 U.S.C. § 1132(a)(1)(B) ) ). Under ERISA, a plan participant or beneficiary may sue "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132 (a)(1)(B). The parties do not dispute that Plaintiff, as a participant under a qualifying ERISA plan, is entitled to bring this suit under ERISA.

In Firestone Tire & Rubber Co. v. Bruch , 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court held that "denial of benefits challenged under [29 U.S.C.] § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." "That means the default is that the administrator has no discretion, and the administrator has to show that the plan gives it discretionary authority in order to get any judicial deference to its decision." Kearney v. Standard Ins. Co. , 175 F.3d 1084, 1089 (9th Cir. 1999), cert. denied , 528 U.S. 964, 120 S.Ct. 398, 145 L.Ed.2d 310 (1999).
"Although Firestone established a de novo default, the exception quickly swallowed the rule: simply by inserting an unambiguous discretionary clause into a plan document, the administrator could ensure that a reviewing court would employ a highly deferential abuse-of-discretion or arbitrary-and-capricious standard in evaluating a denial of benefits." Weisner v. Liberty Life Assurance Company of Boston , 192 F.Supp.3d 601, 609 (D. Md. 2016). State legislatures and insurance regulators have in the recent past enacted statutes, regulations, and administrative rules that either prohibit outright the use of discretionary clauses in insurance contracts or impose limitations on the content and format of these clauses. Id. (citing Davis v. Unum Life Ins. Co. of Am. , No. 4:14-cv-00640-KGB, 2016 WL 1118258, at *3 (E.D. Ark. Mar. 22, 2016) (noting that, as of 2015, nearly half of the states had implemented or were in the process of implementing such restrictions) ). Texas is among those states and recently enacted a law banning insurers' use of delegation clauses. See Tex. Ins. Code § 1701.062(a).

The Court will incorporate the pertinent facts in its discussion of Defendant's objections.

Under an abuse of discretion standard, if the plan fiduciary's decision is supported by substantial evidence and is not arbitrary and capricious, it must prevail. Arrington v. Unum Life Ins. Co. of Am. , No. 1:14-CV-549, 2016 WL 7115970, at *7 (E.D. Tex. Sept. 13, 2016), report and recommendation adopted , No. 1:14-CV-00549, 2016 WL 7104040 (E.D. Tex. Dec. 6, 2016) (citing, among other cases, Bistany v. Reliance Standard Life Ins. Co. , 55 F.Supp.3d 956, 962 (S.D. Tex. 2014) (quoting Ellis v. Liberty Life Assurance Co. of Bos. , 394 F.3d 262, 273 (5th Cir. 2004) ) ). Substantial evidence is "merely 'more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Arrington , 2016 WL 7115970, at *7 (quoting Bistany , 55 F.Supp.3d at 962 (quoting McCorkle v. Metro. Life Ins. Co. , 757 F.3d 452, 457 (5th Cir. 2014) ) ). The court's review needs only assure that the administrator's decision falls somewhere on a continuum of reasonableness, even if on the low end, and need not be particularly complex or technical. Id.

The Court also notes Hightower was a class action brought by hospital employees against a hospital foundation to recoup surplus funds created when the foundation terminated the hospital retirement plan. 65 F.3d at 446. The district court granted partial summary judgment for the employees on the grounds that the foundation maintained the plan, and therefore, any termination of the plan was subject to the provisions of ERISA. Id. On appeal, the Fifth Circuit affirmed in part and reversed in part. Id.
The Fifth Circuit addressed the definition of a governmental plan under ERISA and concluded the exemption of governmental plans is addressed in three parts of the ERISA statute. Cliburn v. Police Jury Ass'n of Louisiana, Inc. , 982 F.Supp. 386, 387 (M.D. La. 1997). The Fifth Circuit held that once the foundation executed the lease agreement with the county, "assumed control of the pension plan and became the employer of the Hospital's employees, the governmental exemption Title IV no longer applied, and the Plan was subject to Title IV." Id. at 450-51. "On the other hand, because the County established the Plan, the Plan remained exempt under Title I even after the County ceased to 'maintain' the Plan by transferring control to the Foundation." Id. at 451.

Defendant also received records from Plaintiff's treating gastroenterologist, David Park, M.D., for office visits in April 2015 and May 2016. AR 1633-59. On May 10, 2016, Plaintiff reported she was still on pain medications for her chronic pain. AR 1633. Plaintiff also reported symptoms of back and joint pain. AR 1634, 1641.

In its reply to Plaintiff's response to its objections, Defendant asserts the R & R notes that in APS Nos. 9 and 10 Dr. Gajraj checked "No" on whether Plaintiff is competent to direct the use of her proceeds but fails to note that in APS Nos. 9 and 10 he also checked "No" on whether Plaintiff has psychiatric/cognitive impairment. Dkt. # 40 at 4, n.3. According to Defendant, this undercuts Plaintiff's claim that Defendant's "multiple determinations over time that [Plaintiff] was disabled, in part, due to her use of class II medications, which she continues to use, suggests that the class II medications would continue to impact [Plaintiff's] ability to work." Id. (citing Dkt. # 38 at 5).

Contrary to Defendant's assertion, the Magistrate Judge did not fail to consider any of the cases it relied upon in its cross motion for judgment on the record. Muniz was a case relied upon by Defendant and specifically referenced by the Magistrate Judge. See Dkt. # 33 at 39. The Magistrate Judge also mentioned Muniz , and two other cases cited by Defendant in its cross motion, in her discussion of the burden of proof. See ids="11883962" index="255" url="https://cite.case.law/f-supp/982/386/#p387">id. at 35 (citing, among other cases, Oliver v. Aetna Life Ins. Co. , 613 Fed. Appx. 892, 896 (11th Cir. 2015) ("[T]he plaintiff bears the burden to prove that he is disabled."); Gilewski v. Provident Life & Accident Ins. Co. , 683 Fed. Appx. 399, 406 (6th Cir. 2017) ("[Plaintiff] must prove by a preponderance of the evidence that he was 'disabled,' as that term is defined in the policy.") ).
Although the Magistrate Judge did not specifically address the court's decision in Hoffmann v. Life Ins. Co. of N. Am. , No. EDCV 13-2011-JGB, 2014 WL 7525482 (C.D. Cal. Dec. 29, 2014), another case relied upon by Defendant, she did mention the case in discussing why she was not convinced the procedural irregularities alleged by Plaintiff are relevant on de novo review. See Dkt. # 33 at 42, n. 21 (citing Haber v. Reliance Standard Life Ins. Co. , No. CV149566MWFMANX, 2016 WL 4154917, at *8 (C.D. Cal. Aug. 4, 2016) (citing Hoffmann , 2014 WL 7525482, at *6 ("Plaintiff makes numerous and wide-ranging arguments alleging improprieties and procedural mistakes by Defendants [including failure to have plaintiff undergo an independent medical examination]. These would be more relevant if the Court were conducting an abuse of discretion analysis. However, as the Court is conducting a de novo review, the focus is on the adequacy of Plaintiff's evidence to support his disability") ) ) ). The court in Hoffmann , in conducting a de novo review, focused on the adequacy of the plaintiff's evidence and concluded the plaintiff had not adequately established a diagnosis of bipolar II disorder as required for further benefits under the relevant plan. 2014 WL 7525482, at *6. Here, the Magistrate Judge also focused on the adequacy of Plaintiff's evidence to support her disability and concluded Plaintiff has shown by a preponderance of the evidence that her disability persisted beyond December 14, 2016.

In her response, Plaintiff states under Social Security's "treating physician rule" a medical opinion from a treating source is given more weight than that of a non-treating source, and if the opinion is also supported by medically acceptable clinical and laboratory evidence, it is given controlling weight. See Dkt. # 38 at 14, n. 33 (citing 20 CFR § 404.1527(c) ). According to Plaintiff, this rule was withdrawn in 2017. Dkt. # 38 at 14, n. 33

The Magistrate Judge was under no such obligation. The Court would further note Defendant was a party in the Reetz case, undercutting any suggestion Defendant might make that it was unaware of the Reetz decision.

Defendant further argues the court in Reetz shifted the burden to the administrator based on prior records and prior payments, and this is contrary to the way the Fifth circuit views these issues and the burden of proof in disability cases. See Dkt. # 37 at 21-22 (citing Hilton v. Ashland Oil Inc. , 103 F.3d 124 (5th Cir. 1996) (unpublished); cf. Corry v. Liberty Life Assur. Co. of Boston , 499 F.3d 389 (5th Cir. 2007) (reversed and rendered for insurer on abuse of discretion standard where administrator paid benefits for five years where claimant continued to seek medical treatment and her treater stated she would be unable to return to any type of "gainful employment") ). As stated above, however, Hilton is distinguishable. The Court addresses Corry in detail below.

In Reetz , Hartford asserted, as in this case, the plaintiff medically improved prior to its denial. The court reviewed the evidence under a de novo standard and disagreed.

However, as further noted by the Magistrate Judge, the Supreme Court also stated a plan administrator "may not arbitrarily refuse to credit a claimant's reliable evidence...." Dkt. # 33 at 51, n. 25 (citing Black & Decker , 538 U.S. at 834, 123 S.Ct. 1965 ). For example, a plan administrator may abuse its discretion when it ignores or misstates the results of a physician's evaluation of the claimant's functional capacity. See Alexander v. Hartford Life & Acc. Ins. Co. , 347 Fed.Appx. 123, 125-26 (5th Cir. 2009) (per curiam). An administrator's failure to provide a peer reviewer with all relevant medical records may also support a finding that the administrator abused its discretion. Davis v. Aetna Life Ins. Co. , No. 3:15-CV-01654-N, 2016 WL 9448704, at *4 (N.D. Tex. May 26, 2016), aff'd , 699 Fed. Appx. 287 (5th Cir. 2017) (citing Franklin v. AT & T Corp. , 2010 WL 669762, at *6 (N.D. Tex. 2010) ).

Under the abuse of discretion standard, on the other hand, the plan administrator's "decision will not be disturbed if it is reasonable, even if this court would have come to a different conclusion independently." Turner , 585 F.Supp.2d at 696 (quoting Ellis v. Metropolitan Life Ins. Co. , 126 F.3d 228, 232 (4th Cir.1997) ).

In its reply to Plaintiff's response to its objections, Defendant asserts nowhere in the R & R is there an analysis of the "contradictions between Plaintiff's current pain management doctor, Dr. Gajraj's June 6, 2017 opinion letter and his medical records. Instead the R & R just accepts Dr. Gajraj's ipse dixit in his opinion letter." Dkt. # 40 at 2.
However, the Magistrate Judge specifically addressed Defendant's argument that more recent medical records from Dr. Gajraj from 2015 to 2017 showed Plaintiff's medication regimen was working. Dkt. # 33 at 43. However, the Magistrate Judge did not find Dr. Gajraj's comments that Plaintiff was "gaining benefit in terms of analgesia and increased function" under her medication regime as compelling as Defendant does. Id. She specifically noted that despite the medications she was taking, Plaintiff was still experiencing pain, pointing out that in each record relied upon by Defendant Dr. Gajraj noted Plaintiff's chief complaint was right low back pain and right leg pain. Id. (citing AR 9-13, AR 1740-49). The Magistrate Judge further noted Dr. Gajraj performed a Sudoscan procedure on May 14, 2015 to detect peripheral neuropathy (damage to the peripheral nerves). Dkt. # 33 at 44 (citing AR 1747-48). The Magistrate Judge found it noteworthy the objective test found possible early signs of peripheral neuropathy. Id.
She also noted more recent records from Plaintiff's treating primary care doctor, Purvi Sanghvi, M.D., from October and December 2016 reveal Plaintiff's chronic pain condition remained unchanged. Dkt. # 33 at 44. Specifically, at the October 2016 visit to establish care with Dr. Sanghvi, Plaintiff admitted low back pain, and Dr. Sanghvi assessed Plaintiff with chronic pain syndrome. Id. (citing AR 6-7). Notably, in Dr. Sanghvi's notes from the December 6, 2016 visit (which was approximately one week before Defendant's denial of LTD benefits), Dr. Sanghvi noted on examination Plaintiff's back was "tender to palpation over lumbar-sacral spine." Id. (citing AR 2).

Although the Magistrate Judge did not specifically address a couple of cases relied upon by Defendant in its cross motion for judgment on the record, presumably it was because she did not find them helpful in her de novo review of the facts involved here. For example, in Hans v. Unum Life Ins. Co. , No. CV 14-02760-AB (MRWx), 2015 WL 5838462 (C.D. Cal. Oct. 5, 2015), a case relied upon by Defendant, the court stated that although "Unum's medical examiners ultimately contradicted Plaintiff's treating physicians and Plaintiff's other medical support, Unum had every right to rely on and give substantial weight to such opinions in making its final decision." Id. at *13.
In Hans , the plaintiff's medical condition was chronic fatigue syndrome ("CFS"), "a subject of discussion and debate within" the Central District of California. Id. at *10. It was the court's understanding that CFS tended to either progress or regress over time; thus, the court was "very mindful of the demarcation between suffering from CFS and CFS rendering one disabled."Id. The parties agreed the plaintiff was entitled to receive benefits from May 2007 to May 2012 due to the symptoms associated with CFS; the dispute arose from Unum's termination of those benefits. Id. Unum argued it relied on a significant improvement in the plaintiff's condition in justifying termination, and the plaintiff argued significant improvement was absent from her updated medical records. Id.
After conducting a de novo review of the evidence, the court found the plaintiff had significantly improved from when he was first diagnosed with CFS, noting the "ongoing CFS symptoms" were no longer present and several physicians had concluded the plaintiff no longer had CFS. Id. at *11-*12.

Defendant's first EAR, which was the only new EAR available to Defendant at the time of its initial denial, determined there were no jobs Plaintiff could perform that would pay a gainful wage under the Policy criteria. See Dkt. # 33 at 53 (citing AR 1926-27). On December 8, 2016, Defendant updated the first EAR using Dr. Sklar's restrictions and limitations in the IME Report. See Dkt. # 33 at 53 (citing AR 1508-09). Unlike the first EAR, the First EAR Addendum identified several occupations Plaintiff was well-suited for based on her education, training, and work history, and which met the earnings requirement in the Policy. AR 1508-09. In her motion for judgment on the record, Plaintiff argued the First EAR Addendum disregarded the functional limitations by Plaintiff's treating doctors, the impact of her chronic pain, and the documented cognitive decline caused by her narcotic medications. See Dkt. # 33 at 53 (citing Dkt. # 17 at 11).

In addition to being able to perform the essential duties (including working the number of hours in a regularly scheduled workweek) of any occupation, there is a separate requirement that Plaintiff be able to earn an amount equal to the product of her Indexed Pre-disability Earnings and her Benefit Percentage. In this case, that amounts to at least $ 4,171.55 per month. Dkt. # 33 at 36, n. 19 (citing Dkt. # 28 at 2-3) (citing AR 869) ). In her response to Defendant's cross motion for judgment on the record, Plaintiff argued there is no evidence from each Dr. Sklar or Dr. Lewis to suggest Plaintiff would be capable of returning to the types of high-level work that would pay her at least $ 4,171.55 per month. Dkt. # 28 at 3. Without addressing what evidence there is in the AR that Plaintiff could also meet the earnings requirement, Defendant argued in its reply that Dr. Sklar's role was not to opine as to whether Plaintiff could work at the type of job that would pay over $ 4,171.55 per month and he is not a professional qualified to offer vocational assessments. Dkt. # 29 at 5.

The Court notes Defendant does not cite McDonald in its discussion of Plaintiff's subjective pain. Rather, Defendant asserts the Magistrate Judge, by adopting the opinions of Plaintiff's treating physicians and ignoring more recent and contradictory evidence in the AR, found in "direct contravention of precedent" that "has explicitly disapproved of ... in the ERISA context ... 'accord[ing] special deference to the opinions of treating physicians.' " Dkt. # 40 at 3 (citing McDonald , 361 Fed. Appx. at 610-11 (quoting Black & Decker , 538 U.S. at 833-34, 123 S.Ct. 1965 ). As explained above, however, although administrators are not obliged to accord special deference to the opinions of treating physicians and do not bear a heightened burden of explanation when they reject a treating physician's opinion, see Black & Decker , 538 U.S. at 825, 830, 123 S.Ct. 1965, that does not mean the Court, engaging in a de novo review, cannot evaluate and give appropriate weight to a treating physician's conclusions if it finds the opinions reliable. See Dkt. # 33 at 50-51.

A decision is arbitrary if there is no rational connection between the known facts and the decision or between the found facts and the evidence. Audino , 129 Fed. Appx. at 883 (citing Dowden v. Blue Cross & Blue Shield of Tex., Inc. , 126 F.3d 641, 644 (5th Cir.1997) (quoting Bellaire Gen. Hosp. v. Blue Cross Blue Shield , 97 F.3d 822, 828 (5th Cir.1996) ) ).

Defendant also lodges additional specific objections, including that the R & R purports to consider conflict of interest as a factor in this case involving de novo review. Dkt # 37 at 22. Defendant argues the distinction between a de novo and an abuse of discretion standard of review is "key" for the "conflicts of interest" issue. Id. at 23.

Where appropriate, any finding of fact herein that should more appropriately be regarded as a conclusion of law shall be deemed as such, and vice versa. See Martin v. Trend Pers. Servs. , No. 3:13-CV-3953-L, 2015 WL 7424757, at *1 (N.D. Tex. Nov. 23, 2015), aff'd , 656 Fed. Appx. 34 (5th Cir. 2016).

Not only does Plaintiff seek recovery of benefits pursuant to § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), she also references § 503 of ERISA, 29 U.S.C. § 1133 ("Claims procedure"). This provision provides that every employee benefit plan shall--
(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.
29 U.S.C.A. § 1133 (West).

The 2,266-page sealed Agreed Administrative Record will be cited herein as "AR."

In Vega v. National Life Insurance Services, Inc. , 188 F.3d 287 (5th Cir. 1999) (en banc), overruled on other grounds by Metro. Life Ins. Co. v. Glenn , 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008), the Fifth Circuit held a plan administrator must identify evidence in the administrative record, giving claimants a chance to contest whether that record is complete. Ariana M. , 884 F.3d at 256 (citing Vega , 188 F.3d at 299 ). Once the record is finalized, a district court must remain within its bounds in conducting a review of the administrator's findings, even in the face of disputed facts. Id. Vega permits departure from this rule only in very limited circumstances. Id. "One exception allows a district court to admit evidence to explain how the administrator has interpreted the plan's terms in previous instances." Ariana M. , 884 F.3d at 256 (citing Vega , 188 F.3d at 299 ) (citing Wildbur v. ARCO Chem. Co. , 974 F.2d 631, 639 n.15 (5th Cir. 1992) ). Another allows a district court to admit evidence, including expert opinions, to assist in the understanding of medical terminology related to a benefits claim. Id. According to the Fifth Circuit in Ariana M. , "those situations are not actually expanding the evidence on which the merits are evaluated but providing context to help the court evaluate the administrative record." 884 F.3d at 256. Here, the Court remains within the bounds of the administrative record.

Of the five Hartford policies spanning Plaintiff's claim, all are identified with the same policy number, GLT-675193, and the same effective date, January 1, 2005. See Docket Entry # 15 at 3. According to Plaintiff, the 2006 policy contained a discretionary clause which, if not found void under Texas law, granted discretionary authority to Hartford, the plan fiduciary. However, the plan administrator removed all discretionary authority from Hartford as of January 1, 2013, nearly four years prior to the date Hartford denied Plaintiff's claim. Id.

AR 1924-25 (APS No. 2); AR 965 (noting "APS [No. 2] and MR [medical records] received from Dr. Martin.").

AR 1918-19 (APS No. 3).

AR 1916-17 (APS No. 4)

The spinal cord stimulator eventually caused an increase in Plaintiff's symptoms, and Dr. Rashbaum surgically removed it in December 2012. AR 1802-03.

During this same period of time, Plaintiff reported in early October 2008 that her position at Gambro was given away, meaning when she was ready to return to work, she would have to reapply. AR 965. In April 2009, Plaintiff reported she had been awarded social security disability benefits. AR 959, 961, 1361, 2059.

By December 8, 2016, inflation caused Plaintiff's gainful wage to increase to $ 4,171.55 per month. AR 869. According to Plaintiff, under the terms of the Policy, she is entitled to a monthly benefit of $ 1,805.02, after an offset for her SSDI benefit. This benefit is scheduled to continue until March 14, 2034. Docket Entry # 15 at 5.

AR 935-36 (November 2010 call); 932-33 (December 2010 call); 929-30 (January 2011 call); 920-21 (June 2011 call); 1850-54 (November 4, 2012 questionnaire); 1838-39 (Fax dated November 5, 2012); 1817-1823 (March 17, 2014 questionnaire); 1824-1830 (Fax dated March 24, 2014); 1785-91 (July 13, 2015 questionnaire); 1777-78 (Fax dated July 14, 2015).

There is no explanation for the change, and the claim notes do not reveal any further, direct SIU activity. Neither is there any indication Plaintiff was notified to disregard the letter SIU had previously sent.

The previous EAR had determined there were no jobs Plaintiff could perform that would pay a gainful wage under the policy criteria. AR 1926-27.

Dr. Fox opined as follows:
Clmt has had chronic pain since original surgery and despite ongoing medical management, including surgery. In addition, clmt has had pain management (including ESI's) and multiple pain medications. Consideration was given for spinal cord stimulator. Currently, clmt uses hydrocodone during the day for pain and OxyContin for nighttime/sleeping....
Alleged limitations caused by claimant's symptoms are supported by medical and other evidence of record.
AR 7542-59.

The majority of the medical records submitted were from 2008 or earlier years. AR 861. The most recent record in the Social Security Disability file was an office visit note from a February 12, 2009 doctor's appointment; MRI scans from June 30, 2009; and CT scans from August 27, 2009.

In Ariana M. v. Humana Health Plan of Tex., Inc. , 884 F.3d 246, 256 (5th Cir. 2018) (en banc), a majority of the en banc court overruled its precedent, Pierre v. Conn. Gen. Life Ins. Co. , 932 F.2d 1552 (5th Cir. 1991) (holding challenges to an administrator's factual determination that a beneficiary is not eligible must be reviewed under the same abuse of discretion standard that applies when plans have delegated discretion). In overruling Pierre , the Fifth Circuit is now aligned with other Circuit Courts of Appeals which have determined the Supreme Court in Bruch mandated that courts apply a de novo standard of review to all ERISA benefits determinations regardless of whether the denials under review were legally-based plan interpretations or factually-based eligibility determinations, unless an administrator has discretionary authority. See Ariana M. , 884 F.3d at 248, 255.

The Court has not located post-Ariana M. cases similar to this one from within this circuit which provide guidance as to the court's task under the de novo review standard. Thus, the Court references law from other circuits.

According to Plaintiff, the two problematic clauses are the requirements that Plaintiff be able to work the number of hours in a regularly scheduled workweek (presumably forty hours) and that she be able to earn an amount equal to the product of her Indexed Pre-disability Earnings and her Benefit Percentage, which amounts to at least $ 4,171.55 per month. See Docket Entry # 28 at 2-3 (citing AR 869).

In Reetz , Hartford awarded the plaintiff both short term and long term disability benefits - for almost two years - on account of her fibromyalgia and back pain, "which strongly suggest[ed] that she was disabled." 294 F.Supp.3d at 1079. The court in Reetz expected to see evidence of improvement in the period of time leading up to the date when Hartford determined Plaintiff was no longer disabled. Id. at 1079-80. The court disagreed with Hartford's assertion that the plaintiff saw improvement in her functionality. Id. at 1080. According to the court, "the record evinces that [the plaintiff's] chronic pain remained, at best, unchanged, and may have worsened." Id.

Plaintiff takes issue with Hartford's position that Plaintiff's medical records between 2008 and 2017 demonstrate "significant improvement" by July 2016, arguing medical improvement was not given as a reason for the termination of her benefits in Hartford's denial letter. Docket Entry # 27 at 5-6 (quoting Docket Entry # 26 at 6-7). According to Plaintiff, Hartford's new argument, that the continuous use of Fentanyl and Dilaudid for breakthrough pain has now rendered Plaintiff's functionality improved to the extent she can perform the essential functions of any occupation, is substantially different from the reasons given in the denial letter and is in violation of § 503 of ERISA. Plaintiff also asserts other procedural violations under § 503 of ERISA, which she claims denied her a "full and fair review" of the administrator's decision to deny benefits.
In her briefing, Plaintiff relies on White v. Life Ins. Co. of N. America , 892 F.3d 762, n. 2 (5th Cir. 2018), Hackett v. Xerox Corp. Long-Term Disability Plan , 315 F.3d 771, 775 (7th Cir. 2003), and Robinson v. Aetna Life Ins. Co. , 443 F.3d 389, 393 (5th Cir. 2006), asserting violations of § 503 can support damages and reversal of denial. However, in all three cases, the courts reviewed the plan administrators' decisions under the abuse of discretion, rather than the de novo , standard. The Court has been unable to find Fifth Circuit authority directly addressing the impact, if any, that procedural deficiencies may have on cases where the court conducts de novo review. See Ermovick v. Mitchell, Silberberg & Knupp LLP Long Term Disability Coverage for All Employees , No. 2:05-CV-06018-JHN-VB, 2010 WL 3956819, at *9 (C.D. Cal. Oct. 8, 2010), aff'd sub nom. Ermovick v. Mitchell Silberberg & Knupp LLP Long Term Disability For All Employees , 472 Fed. Appx. 459 (9th Cir. 2012) (noting no Ninth Circuit authority directly addressing the issue).
Thus, the Court is not convinced the alleged procedural irregularities are relevant on de novo review. Haber v. Reliance Standard Life Ins. Co. , No. CV149566MWFMANX, 2016 WL 4154917, at *8 (C.D. Cal. Aug. 4, 2016) (citing Hoffmann v. Life Ins. Co. of N. Am. , No. EDCV 13-2011-JGB, 2014 WL 7525482, at *6 (C.D. Cal. Dec. 29, 2014) ) ("Plaintiff makes numerous and wide-ranging arguments alleging improprieties and procedural mistakes by Defendants [including failure to have plaintiff undergo an independent medical examination]. These would be more relevant if the Court were conducting an abuse of discretion analysis. However, as the Court is conducting a de novo review, the focus is on the adequacy of Plaintiff's evidence to support his disability").

According to Plaintiff, this "strongly suggests that Dr. Gajraj felt [Plaintiff] was experiencing cognitive dysfunction, either secondary to her chronic pain or more likely due to her long-term use of class II narcotics." Docket Entry # 27 at 3.

In her in-person interview, Plaintiff explained she has good days and bad days. The Fentanyl patch, which helps mask a lot of her pain, lasts two days. AR 1283-84. After she changes the patch on the second day, she experiences more pain because "it takes a while for it to get back up to a certain level for [her] to feel like [she] can move a little bit better, you know, to kind of get over that pain." AR 1283.

According to Plaintiff, the only doctors who state she can work forty hours per week are Hartford's reviewers, Drs. Sklar and Lewis-and neither of them suggest Plaintiff is capable of returning to the type of high-level work that would pay her at least $ 4,171.55 per month. Docket Entry # 28 at 3.

In Black & Decker , the Supreme Court stated that, unlike the SSA, ERISA plan administrators need not give special deference to a claimant's treating physician. 538 U.S. at 834, 123 S.Ct. 1965. However, the Court in Black & Decker also observed that ERISA plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." Id.

Plaintiff states on April 10, 2017, four months after Hartford denied her claim, the Social Security Administration reevaluated Plaintiff's claim and determined she continued to be Totally Disabled under SSA standards. See AR 1361-62.

In preparing the First EAR Addendum, the consultant was instructed to consider the function opined by Dr. Sklar (that Plaintiff could work forty hours per week, sit six hours per day, and stand and walk two hours per day, with no repetitive bending or twisting) and determine if the updated function would "alter the outcome of the [first] EAR completed on 4/22/10." AR 1508.

According to Plaintiff, the sole evidence Hartford relies on for its contention that Plaintiff is capable of earning at least $ 4,171.55 is the revised EAR it conducted immediately prior to denying her claim. Plaintiff asserts this was an in-house report prepared by Hartford employees-not independent experts. In order to secure the Second EAR Addendum, Hartford instructed that the analyst not consider the restrictions and limitations provided by any of Plaintiff's treating physicians. The Court accords little weight to the Second EAR Addendum.

The Policy provides that monthly benefits will be reduced by income from other benefit, including those from the SSA.

Although the Court does not find the Bowen factor four weighs in favor of Plaintiff, the Court notes this case did present (although did not necessarily resolve) a significant legal issue, namely how to address, if at all, alleged procedural violations of § 503 in a de novo review.